**MAI SYSTEMS CORPORATION,
a Delaware corporation,
Plaintiff-Appellee,**

v.

**PEAK COMPUTER, INC., a California corporation; Vincent Chiechi, an individual; Eric Francis, an individual, Defendants-Appellants.**

**MAI SYSTEMS CORPORATION,
a Delaware corporation,
Plaintiff-Appellee,**

v.

**PEAK COMPUTER, INC., a California corporation; Vincent Chiechi, an individual; Eric Francis, an individual, Defendants-Appellants.**

Nos. 92-55363, 93-55106.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June
4, 1992 in No. 92-55363.

Submitted Feb. 24, 1993 in No. 93-55106.*

Decided April 7, 1993.

---

* The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App.P. 34(a); Ninth Circuit Rule 34-4.

**513**

William J. Robinson, Graham & James, Los Angeles, CA, for plaintiff-appellee.

James W. Miller, Musick, Peeler & Garrett, Los Angeles, CA, for defendants-appellants.

BEFORE: PREGERSON, BRUNETTI, and FERNANDEZ, Circuit Judges.

BRUNETTI, Circuit Judge:

Peak Computer, Inc. and two of its employees appeal the district court's order issuing a preliminary injunction pending trial as well as the district court's order issuing a permanent injunction following the grant of partial summary judgment.

## I. FACTS

MAI Systems Corp., until recently, manufactured computers and designed software to run those computers. The company continues to service its computers and the software necessary to operate the computers. MAI software includes operating system software, which is necessary to run any other program on the computer.

Peak Computer, Inc. is a company organized in 1990 that maintains computer systems for its clients. Peak maintains MAI computers for more than one hundred clients in Southern California. This accounts for between fifty and seventy percent of Peak's business.

Peak's service of MAI computers includes routine maintenance and emergency repairs. Malfunctions often are related to the failure of circuit boards inside the computers, and it may be necessary for a Peak technician to operate the computer and its operating system software in order to service the machine.

In August, 1991, Eric Francis left his job as customer service manager at MAI and joined Peak. Three other MAI employees joined Peak a short time later. Some businesses that had been using MAI to service their computers switched to Peak after learning of Francis's move.

## II. PROCEDURAL HISTORY

On March 17, 1992, MAI filed suit in the district court against Peak, Peak's president Vincent Chiechi, and Francis. The complaint includes counts alleging copyright infringement, misappropriation of trade secrets, trademark infringement, false advertising, and unfair competition.

MAI asked the district court for a temporary restraining order and preliminary injunction pending the outcome of the suit. The district court issued a temporary restraining order on March 18, 1992 and converted it to a preliminary injunction on March 26, 1992. On April 15, 1992, the district court issued a written version of the preliminary injunction along with findings of fact and conclusions of law.

The preliminary injunction reads as follows:

A. Defendants [and certain others] are hereby immediately restrained and enjoined pending trial of this action from:

1. infringing MAI's copyrights in any manner and from using, publishing, copying, selling, distributing or otherwise dis-

posing of any copies or portions of copies of the following MAI copyrighted computer program packages: "MPx," "SPx," "GPx40," and "GPx70" (collectively hereinafter, "The Software");

2. misappropriating, using in any manner in their business including advertising connected therewith, and/or disclosing to others MAI's trade secrets and confidential information, including, without limitation, The Software, MAI's Field Information Bulletins ("FIB") and Customer Database;

3. maintaining any MAI computer system, wherein:

(a) "maintaining" is defined as the engaging in any act, including, without limitation, service, repair, or upkeep in any manner whatsoever, that involves as part of such act, or as a preliminary or subsequent step to such act, the use, directly or indirectly, of The Software, including, without limitation, MAI's operating system, diagnostic, utility, or other software;

(b) "use" is defined as including, without limitation, the acts of running, loading, or causing to be run or loaded, any MAI software from any magnetic storage or read-only-memory device into the computer memory of the central processing unit of the computer system; and

(c) "computer system" is defined as an MAI central processing unit in combination with either a video display, printer, disk drives, and/or keyboard;

4. soliciting any MAI computer maintenance customer pursuant to Francis' employment contracts with MAI;

5. maintaining any contract where customer information was obtained by Francis while employed by MAI pursuant to Francis' employment contract with MAI;

6. using in any manner in their business, or in advertising connected therewith, directly or indirectly, the trademarks MAI, BASIC FOUR, and/or MAI Basic Four, the letters MAI (collectively, the "MAI Trademarks") or any mark, word, or name similar to or in combination with MAI's marks that are likely to cause confusion, mistake or to deceive;

7. committing any act which otherwise infringes any of the MAI Trademarks;

8. advertising, directly or indirectly, that MAI Basic Four is part of Peak's Product line, that Peak has "satellite facilities," and/or that Peak's technicians are "specifically trained on the latest hardware releases of MAI;" and

9. engaging in any other acts that amount to unfair competition with MAI.

B. IT IS FURTHER ORDERED that Defendants [and certain others] shall hereby, pending trial in this action:

1. provide a full accounting of all MAI property, including all copyrighted works presently in their possession; and

2. retain any fees paid to them by any MAI maintenance client and place any such fees in an interest bearing escrow account pending final determination of the action at trial or further order of this Court.

We stayed the preliminary injunction in part by an order of June 9, 1992 which provides:

The preliminary injunction issued by the district court on April 15, 1992 is stayed to the following extent:

Section (A)(1), enjoining defendants from "infringing MAI's copyrights in any manner and from using, publishing, copying, selling, distributing, or otherwise disposing of any copies or portions of copies" or certain MAI software, is stayed to the extent that it prohibits defendants from operating MAI computers in order to maintain them.

Section A(2), enjoining defendants from misappropriating MAI trade secrets, is stayed to the extent that it prohibits defendants from operating MAI computers in order to maintain them.

Section A(3), enjoining defendants from "maintaining any MAI computer system," is stayed in its entirety, including subsections (a), (b), and (c).

Section (B), ordering defendants to "provide a full accounting of all MAI property" and to retain fees paid to them

by "any MAI maintenance client" in an escrow account, is stayed in its entirety, including subsections (1) and (2).

The remainder of the district court's preliminary injunction shall remain in effect. This order shall remain in effect pending further order of this court.

In January, 1993, we denied a motion by Peak to stay the district court proceedings. The district court then heard a motion for partial summary judgment on some of the same issues raised in the preliminary injunction. The district court granted partial summary judgment for MAI and entered a permanent injunction on the issues of copyright infringement and misappropriation of trade secrets on February 2, 1993 which provides:

A. Defendants [and certain others] are hereby permanently enjoined as follows:

1. Peak [and certain others] are permanently enjoined from copying, disseminating, selling, publishing, distributing, loaning, or otherwise infringing MAI's copyrighted works, or any derivatives thereof, including those works for which registrations have issued, and works for which registrations may issue in the future. The "copying" enjoined herein specifically includes the acts of loading, or causing to be loaded, directly or indirectly, any MAI software from any magnetic storage or read only memory device into the electronic random access memory of the central processing unit of a computer system. As used herein, "computer system" means an MAI central processing unit in combination with either a video display, printer, disk drives, and/or keyboard.

MAI's copyrighted works, and their derivatives, for which registrations have issued include:

| Work | Cert. of Reg. No. | Date Issued |
| --- | --- | --- |
| BOSS/IX SOFTWARE VERSION 7.5B*20 | TX 3 368 502 | 12/16/91 |
| BOSS/VS LEVEL 7A*42 DIAGNOSTICS | TXU 524 424 (Supp.) TXU 507 015 (Basic) | 7/01/92 3/09/92 |
| BOSS/VS LEVEL 7.5B DIAGNOSTICS | TXU 524 423 (Supp.) TXU 507 013 (Basic) | 7/01/92 3/09/92 |

Additional MAI copyright registrations are listed on Exh. A hereto.

2. (a) Peak and Francis [and certain others] are permanently enjoined from misappropriating, using in any manner in their business, including advertising connected therewith, and/or disclosing to others MAI's trade secrets, as that term is used in California Civil Code § 3426.-1(d). MAI's trade secrets, for purposes of this injunction, shall include, but not be limited to the following: MAI's software, MAI's Field Information Bulletins ("FIB") and all information in such FIB's, and MAI Customer Database and all information in such Database.

(b) In particular, the persons identified in subparagraph (a) herein are permanently enjoined from soliciting any MAI computer maintenance customer and from maintaining any contract with any former MAI computer maintenance customer where knowledge of any such customers was obtained by Francis during his employment with MAI.

We then stayed the permanent injunction in part by an order on February 4, 1993 which provides:

Appellants' emergency motion for stay of the district court's permanent injunction is granted in part. The injunction entered by the district court on February 2, 1993 is stayed to the following extent:

Section (A)(1), enjoining defendants from "infringing MAI's copyrighted works," is stayed to the extent that it prohibits defendants from loading MAI software or operating MAI computers in order to maintain them.

Section A(2), enjoining defendants from misappropriating MAI trade secrets, is stayed to the extent that it pro-

hibits defendants from loading MAI software or operating MAI computers in order to maintain them.

The remainder of the district court's permanent injunction shall remain in effect. . . .

Since the permanent injunction covers some of the same issues appealed in the preliminary injunction, the appeal of those issues in the context of the preliminary injunction has become moot. *See Burbank–Glendale–Pasadena Airport Authority v. Los Angeles,* 979 F.2d 1338, 1340 n. 1 (9th Cir.1992). Therefore, we grant MAI's motion to dismiss the appeal of the preliminary injunction relative to the issues of copyright infringement and trade secret misappropriation. Since other issues covered in the preliminary injunction are not covered in the permanent injunction,[1] the appeals have been consolidated and both the permanent injunction and parts of the preliminary injunction are reviewed here.

## III. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over interlocutory orders granting injunctions under 28 U.S.C. § 1292(a)(1).

> In addition, an appeal under 28 U.S.C. § 1292(a)(1) brings before the court the entire order, and, in the interests of judicial economy the court may decide the merits of the case. The court, however, generally will chose to decide only those matters 'inextricably bound up with' the injunctive relief.

*Bernard v. Air Line Pilots Ass'n, Int'l, AFL–CIO,* 873 F.2d 213, 215 (9th Cir.1989) (citations omitted).

In this case, the district court's grant of the permanent injunction is "inextricably bound up" with the underlying decisions of that court on the merits of the copyright and trade secrets claims. Therefore, our review of the propriety of the permanent injunction is inextricably tied to the underlying decision, and this court has jurisdiction to review the entire order. *Id.*

A grant of summary judgment is reviewed de novo.[2] We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Federal Deposit Ins. Corp. v. O'Melveny & Meyers,* 969 F.2d 744, 747 (9th Cir.1992). The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. *Id.*

A district court's grant of preliminary injunctive relief is subject to limited review. This court will reverse a preliminary injunction only where the district court "abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." However, "questions of law underlying the issuance of a preliminary injunction" are reviewed de novo. *Glick v. McKay,* 937 F.2d 434, 436 (9th Cir.1991).

"To obtain a preliminary injunction, a party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in [the movant's] favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Diamontiney v. Borg,*

---

1. These issues include trademark infringement and false advertising.

2. The Central District of California's Local Rule 7.14 provides for the filing of a Statement of Uncontroverted Facts and Conclusions of Law with each motion for summary judgment and for the filing of a Statement of Genuine Issues of Material Fact with all opposition papers. In granting summary judgment, the district court had before it these papers as well as MAI's Motion for Summary Judgment, Peak's Opposition, and MAI's Response. MAI's Statement of Uncontroverted Facts and Conclusions of Law and Peak's Statement of Genuine Issues of Material Fact rely on the declarations and deposition testimony which were filed with the district court in connection with MAI's earlier motion for a preliminary injunction. These declarations and deposition testimony make up the record in this case.

918 F.2d 793, 795 (9th Cir.1990) (internal quotations and citations omitted).

In other words, "[w]here a party can show a strong chance of success on the merits, he need only show a possibility of irreparable harm. Where, on the other hand, a party can show only that serious questions are raised, he must show that the balance of hardships tips sharply in his favor." *Bernard v. Air Line Pilots Ass'n, Int'l, AFL–CIO*, 873 F.2d 213, 215 (9th Cir.1989).

## IV. COPYRIGHT INFRINGEMENT

The district court granted summary judgment in favor of MAI on its claims of copyright infringement and issued a permanent injunction against Peak on these claims. The alleged copyright violations include: (1) Peak's running of MAI software licenced to Peak customers; (2) Peak's use of unlicensed software at its headquarters; and, (3) Peak's loaning of MAI computers and software to its customers. Each of these alleged violations must be considered separately.

### A. Peak's running of MAI software licenced to Peak customers

■ To prevail on a claim of copyright infringement, a plaintiff must prove ownership of a copyright and a " 'copying' of protectable expression" beyond the scope of a license. *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir.1989).

MAI software licenses allow MAI customers to use the software for their own internal information processing.[3] This allowed use necessarily includes the loading of the software into the computer's random access memory ("RAM") by a MAI customer. However, MAI software licenses do not allow for the use or copying of MAI software by third parties such as Peak. Therefore, any "copying" done by Peak is "beyond the scope" of the license.

It is not disputed that MAI owns the copyright to the software at issue here, however, Peak vigorously disputes the district court's conclusion that a "copying" occurred under the Copyright Act.

The Copyright Act defines "copies" as: material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

17 U.S.C. § 101.

The Copyright Act then explains:
A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise com-

---

**3.** A representative MAI software license provides in part:

    4. *Software License.*
    (a) *License.* . . . Customer may use the Software (one version with maximum of two copies permitted—a working and a backup copy) . . . solely to fulfill Customer's own internal information processing needs on the particular items of Equipment . . . for which the Software is configured and furnished by [MAI]. The provisions of this License . . . shall apply to all versions and copies of the Software furnished to Customer pursuant to this Agreement. The term "Software" includes, without limitation, all basic operating system software. . . .
    (b) *Customer Prohibited Acts.* . . . Any possession or use of the Software . . . not expressly authorized under this License or any act which might jeopardize [MAI]'s rights or interests in the Software . . . is prohibited, including without limitation, examination, dis-

closure, copying, modification, reconfiguration, augmentation, adaptation, emulation, visual display or reduction to visually perceptible form or tampering. . . .
    (c) *Customer Obligations.* Customer acknowledges that the Software is [MAI]'s valuable and exclusive property, trade secret and copyrighted material. Accordingly, Customer shall . . . (i) use the Software . . . strictly as prescribed under this License, (ii) keep the Software . . . confidential and not make [it] available to others. . . .
A representative diagnostic license agreement provides in part:
   ·6. *Access/Non–Disclosure.*
Licensee shall not give access nor shall it disclose the Diagnostics (in any form) . . . to any person . . . without the written permission of [MAI]. Licensee may authorize not more than three (3) of its *bona fide* employees to utilize the Diagnostics . . . if, and only if, they agree to be bound by the terms hereof.

municated for a period of more than transitory duration.

17 U.S.C. § 101.

■ The district court's grant of summary judgment on MAI's claims of copyright infringement reflects its conclusion that a "copying" for purposes of copyright law occurs when a computer program is transferred from a permanent storage device to a computer's RAM. This conclusion is consistent with its finding, in granting the preliminary injunction, that: "the loading of copyrighted computer software from a storage medium (hard disk, floppy disk, or read only memory) into the memory of a central processing unit ("CPU") causes a copy to be made. In the absence of ownership of the copyright or express permission by license, such acts constitute copyright infringement." We find that this conclusion is supported by the record and by the law.

Peak concedes that in maintaining its customer's computers, it uses MAI operating software "to the extent that the repair and maintenance process necessarily involves turning on the computer to make sure it is functional and thereby running the operating system." It is also uncontroverted that when the computer is turned on the operating system is loaded into the computer's RAM. As part of diagnosing a computer problem at the customer site, the Peak technician runs the computer's operating system software, allowing the technician to view the systems error log, which is part of the operating system, thereby enabling the technician to diagnose the problem.[4]

■ Peak argues that this loading of copyrighted software does not constitute a copyright violation because the "copy" created in RAM is not "fixed." However, by showing that Peak loads the software into the RAM and is then able to view the system error log and diagnose the problem with the computer, MAI has adequately shown that the representation created in the RAM is "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."

After reviewing the record, we find no specific facts (and Peak points to none) which indicate that the copy created in the RAM is not fixed. While Peak argues this issue in its pleadings, mere argument does not establish a genuine issue of material fact to defeat summary judgment. A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials in pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Proc. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989).

The law also supports the conclusion that Peak's loading of copyrighted software into RAM creates a "copy" of that software in violation of the Copyright Act. In *Apple Computer, Inc. v. Formula Int'l, Inc.*, 594 F.Supp. 617, 621 (C.D.Cal.1984), the district court held that the copying of copyrighted software onto silicon chips and subsequent sale of those chips is not protected by § 117 of the Copyright Act. Section 117 allows "the 'owner' [5] of a copy of a computer program to make or authorize the making of another copy" without infringing copyright law, if it "is an essential step in the utilization of the computer program" or if the new copy is "for archival purposes

---

**4.** MAI also alleges that Peak runs its diagnostic software in servicing MAI computers. Since Peak's running of the operating software constitutes copyright violation, it is not necessary for us to directly reach the issue of whether Peak also runs MAI's diagnostic software. However, we must note that Peak's field service manager, Charles Weiner, admits that MAI diagnostic software is built into the MAI MPx system and, further, that if Peak loads the MAI diagnostic software from whatever source into the computer's RAM, that such loading will produce the same copyright violation as loading the operating software.

**5.** Since MAI licensed its software, the Peak customers do not qualify as "owners" of the software and are not eligible for protection under § 117.

only." 17 U.S.C. § 117 (Supp.1988).[6] One of the grounds for finding that § 117 did not apply was the court's conclusion that the permanent copying of the software onto the silicon chips was not an "essential step" in the utilization of the software because the software could be used through RAM without making a permanent copy. The court stated:

> RAM can be simply defined as a computer component in which data and computer programs can be temporarily recorded. Thus, the purchaser of [software] desiring to utilize all of the programs on the diskette could arrange to copy [the software] into RAM. This would only be a temporary fixation. It is a property of RAM that when the computer is turned off, the copy of the program recorded in RAM is lost.

*Apple Computer* at 622.

While we recognize that this language is not dispositive, it supports the view that the copy made in RAM is "fixed" and qualifies as a copy under the Copyright Act.

We have found no case which specifically holds that the copying of software into RAM creates a "copy" under the Copyright Act. However, it is generally accepted that the loading of software into a computer constitutes the creation of a copy under the Copyright Act. *See e.g. Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 260 (5th Cir.1988) ("the act of loading a program from a medium of storage into a computer's memory creates a copy of the program"); 2 *Nimmer on Copyright*, § 8.08 at 8–105 (1983) ("Inputting a computer program entails the preparation of a copy."); *Final Report of the National Commission on the New Technological Uses of Copyrighted Works*, at 13 (1978) ("the placement of a work into a computer is the preparation of a copy"). We recognize that these authorities are somewhat

troubling since they do not specify that a copy is created regardless of whether the software is loaded into the RAM, the hard disk or the read only memory ("ROM"). However, since we find that the copy created in the RAM can be "perceived, reproduced, or otherwise communicated," we hold that the loading of software into the RAM creates a copy under the Copyright Act. 17 U.S.C. § 101. We affirm the district court's grant of summary judgment as well as the permanent injunction as it relates to this issue.

**B. Use of unlicensed software at headquarters**

■ It is not disputed that Peak has several MAI computers with MAI operating software "up and running" at its headquarters. It is also not disputed that Peak only has a license to use MAI software to operate one system. As discussed above, we find that the loading of MAI's operating software into RAM, which occurs when an MAI system is turned on, constitutes a copyright violation. We affirm the district court's grant of summary judgment in favor of MAI on its claim that Peak violated its copyright through the unlicensed use of MAI software at Peak headquarters, and also affirm the permanent injunction as it relates to this issue.

**C. Loaning of MAI computers and software**

■ MAI contends that Peak violated the Copyright Act by loaning MAI computers and software to its customers. Among the exclusive rights given to the owner of a copyrighted work is the right to distribute copies of the work by lending. 17 U.S.C. § 106(3). Therefore, Peak's loaning of MAI software, if established, would constitute a violation of the Copyright Act.

---

6. The current § 117 was enacted by Congress in 1980, as part of the Computer Software Copyright Act. This Act adopted the recommendations contained in the *Final Report of the National Commission on New Technological Uses of Copyrighted Works* ("CONTU") (1978). H.R.Rep. No. 1307, 96th Cong., 2d Sess., pt. 1, at 23. The CONTU was established by Congress in 1974 to perform research and make recommen-

dations concerning copyright protection for computer programs. The new § 117 reflects the CONTU's conclusion that: "Because the placement of a work into a computer is the preparation of a copy, the law should provide that persons in rightful possession of copies of programs be able to use them freely without fear of exposure to copyright liability." *Final Report* at 13.

MAI argues that it is clear that Peak loaned out MAI computers because Peak advertisements describe the availability of loaner computers for its customers and Chiechi admitted that the available loaners included MAI computers. However, there was no evidence that a MAI computer was ever actually loaned to a Peak customer. Paul Boulanger, a Senior Field Engineer at Peak, testified in his deposition that he was not aware of any MAI systems being loaned to Peak customers or of any customer asking for one. Charles Weiner, a Field Service Manager at Peak, testified in his deposition that he did not have any knowledge of MAI systems being loaned to customers. Weighing this evidence in the light most favorable to Peak, whether Peak actually loaned out any MAI system remains a genuine issue of material fact.

As a general rule, a permanent injunction will be granted when liability has been established and there is a threat of continuing violations. *See, National Football League v. McBee & Bruno's, Inc.,* 792 F.2d 726, 732 (8th Cir.1986); 3 *Nimmer on Copyright* § 14.06[B] at 14–88. However § 502(a) of the Copyright Act authorizes the court to "grant temporary and final injunctions on such terms as it may deem reasonable *to prevent or restrain* infringement of a copyright." 17 U.S.C. § 502(a) (emphasis added). While there has been no showing that Peak has actually loaned out any MAI software, the threat of a violation is clear as Peak has MAI computers in its loaner inventory. The permanent injunction is upheld as it relates to this issue.

## V. MISAPPROPRIATION OF TRADE SECRETS

The district court granted summary judgment in favor of MAI on its misappropriation of trade secrets claims and issued a permanent injunction against Peak on these claims. The permanent injunction prohibits Peak from "misappropriating, using in any manner in their business, including advertising connected therewith, and/or disclosing to others MAI's trade secrets," including: (1) MAI Customer Database; (2) MAI Field Information Bulletins ("FIB"); and, (3) MAI software.

Peak argues that since MAI's motion for summary judgment only included argument regarding the customer database as a trade secret that the grant of summary judgment on the FIBs and software was overbroad. However, in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that "so long as the losing party was on notice that she had to come forward with all of her evidence," summary judgment can properly be entered. *Id.* at 326, 106 S.Ct. at 2554. Although *Celotex* dealt with the court's authority to grant summary judgment *sua sponte*, its notice analysis is applicable to any summary judgment motion.

MAI argues that Peak had adequate notice because, while MAI only presented argument regarding the customer database, it moved for summary judgment on its claims of misappropriation of trade secrets generally, and, because MAI's Statement of Uncontroverted Facts included statements that the FIBs and software were trade secrets. We agree. However, we do not agree with MAI's contention that Peak has waived its right to appeal summary judgment on these issues by failing address the merits in the district court. Therefore, we reach the merits of the grant of summary judgment on each trade secret claim.

### A. Customer Database

California has adopted the Uniform Trade Secrets Act ("UTSA") which codifies the basic principles of common law trade secret protection. Cal.Civ.Code §§ 3426–3426.10 (West Supp.1993). To establish a violation under the UTSA, it must be shown that a defendant has been unjustly enriched by the improper appropriation, use or disclosure of a "trade secret."

Peak argues both that the MAI Customer Database is not a "trade secret," and that even if it is a trade secret, that Peak did not "misappropriate" it.

The UTSA defines a "trade secret" as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal.Civ.Code § 3426.1(d) (West Supp.1993).

MAI contends its Customer Database is a valuable collection of data assembled over many years that allows MAI to tailor its service contracts and pricing to the unique needs of its customers and constitutes a trade secret.

■■■■■ We agree that the Customer Database qualifies as a trade secret. The Customer Database has potential economic value because it allows a competitor like Peak to direct its sales efforts to those potential customers that are already using the MAI computer system. Further, MAI took reasonable steps to insure the secrecy to this information as required by the UTSA. MAI required its employees to sign confidentiality agreements respecting its trade secrets, including the Customer Database. Thus, under the UTSA, the MAI Customer Database constitutes a trade secret.

We also agree with MAI that the record before the district court on summary judgment establishes that Peak misappropriated the Customer Database.

"Misappropriation" is defined under the UTSA as:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;[7] or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of his or her position knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or by mistake.

Cal.Civ.Code § 3426.1(b) (West Supp.1993).

Peak contends that Francis never physically took any portion of MAI's customer database and that neither Francis nor anyone under his direction put information he had obtained from working at MAI in the Peak database. However, to find misappropriation under the UTSA, this need not be established.

■■■■■ The UTSA definition of "misappropriation" has been clarified by case law which establishes that the right to *announce* a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition, and that the common law right to compete fairly and the right to announce a new business affiliation have survived the enactment of the UTSA. *American Credit Indem. Co. v. Sacks*, 213 Cal. App.3d 622, 262 Cal.Rptr. 92, 99–100 (Cal. Ct.App.1989). However, misappropriation occurs if information from a customer database is used to *solicit* customers. *Id.*

■■■■■ Merely informing a former employer's customers of a change of employment, without more, is not solicitation. *Id.* 262 Cal.Rptr. at 99 (citing *Aetna Bldg. Maintenance Co. v. West*, 39 Cal.2d 198, 246 P.2d 11 (1952)). However, in this case, Francis did more than merely announce his new affiliation with Peak. When Francis began

---

7. The UTSA defines "improper means," as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Cal.Civ.Code § 3426.1(a) (West Supp.1993).

working for Peak, he called MAI customers whose names he recognized. Additionally, Francis personally went to visit some of these MAI customers with proposals to try and get them to switch over to Peak. These actions constituted solicitation and misappropriation under the UTSA definition. We affirm the district court's grant of summary judgment in favor of MAI on its claim that Peak misappropriated its Customer Database and affirm the permanent injunction as it relates to this issue.

## B. Field Information Bulletins

MAI argues summary judgment was properly granted on its claim of misappropriation of the FIBs because the FIBs are a valuable trade secret of MAI and the evidence showed that the FIBs were being used by Peak to operate a business competing unfairly with MAI.

■ We agree that the FIBs constitute trade secrets. It is uncontroverted that they contain technical data developed by MAI to aid in the repair and servicing of MAI computers, and that MAI has taken reasonable steps to insure that the FIBs are not generally known to the public.

■ However, whether Peak has misappropriated the FIBs remains a genuine issue of material fact. The only evidence introduced by MAI to establish Peak's use of the FIBs is Peak's advertisements claiming that "Peak's system specialists are specifically trained on the latest hardware releases on MAI Basic Four." MAI asserts that if Peak did not use FIBs that this claim would have to be false. However, Weiner and Boulanger testified in their depositions that they had never seen a FIB at Peak. Similarly, Boulanger, Robert Pratt and Michael McIntosh[8] each testified that they did not have any FIB information when they left MAI. Weighing this evidence in the light most favorable to Peak, whether Peak used any of the FIBs remains a genuine issue of material fact, and the district court's grant of summary judgment on this claim of trade secret misappropriation is reversed and the permanent

injunction is vacated as it relates to this issue.

## C. Software

MAI contends the district court properly granted summary judgment on its claim of misappropriation of software because its software constitutes valuable unpublished works that allow its machines to be maintained. MAI argues that Peak misappropriated the software by loading it into the RAM.

■ We recognize that computer software can qualify for trade secret protection under the UTSA. *See e.g., S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1089–90 (9th Cir.1989). However, a plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist. *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 67 Cal.Rptr. 19, 22–24 (1968); *see also Universal Analytics Inc. v. MacNeal–Schwendler Corp.*, 707 F.Supp. 1170, 1177 (C.D.Cal.1989) (plaintiff failed to inform defendant or the court "precisely which trade secret it alleges was misappropriated"), *aff'd*, 914 F.2d 1256 (9th Cir.1990).

Here, while MAI asserts that it has trade secrets in its diagnostic software and operating system, and that its licensing agreements constitute reasonable efforts to maintain their secrecy, MAI does not specifically identify these trade secrets. In his Declaration, Joseph Perez, a Customer Service Manager at MAI, stated that the diagnostic software "contain valuable trade secrets of MAI," however, the Declaration does not specify what these trade secrets are. Additionally, we find *no declaration or deposition testimony which specifically identifies any trade secrets*. Since the trade secrets are not specifically identified, we cannot determine whether Peak has misappropriated any trade secrets by running the MAI operating software and/or diagnostic software in maintaining MAI systems for its customers, and we reverse the district court's grant of summary judgment in favor of MAI on its claim that

---

**8.** Pratt and Boulanger are both computer technicians who left MAI to work at Peak.

Peak misappropriated trade secrets in its computer software and vacate the permanent injunction as it relates to this issue.

## VI. BREACH OF CONTRACT

The district court granted summary judgment in favor of MAI on its breach of contract claim against Eric Francis. It is clear from the depositions of Francis and Chiechi that Francis solicited customers and employees of MAI in breach of his employment contract with MAI, and we affirm the district court's grant of summary judgment on this issue and affirm the permanent injunction as it relates to this claim.

## VII. PRELIMINARY INJUNCTION

### A. Trademark Infringement

In granting the preliminary injunction, the district court found that Peak advertisements that "MAI Basic Four" computers are part of "Peak's Product Line" imply that Peak is a MAI dealer for new computers and constitute trademark infringement. The district court also found that: "Such acts are likely to cause confusion, mistake or deception in that potential purchasers of MAI computers and/or maintenance services will be led to believe that Peak's activities are associated with or sanctioned or approved by MAI."

Peak claims that the district court erred in granting the preliminary injunction because it did not apply the legal tests established by the Ninth Circuit to evaluate whether a likelihood of confusion existed. *See e.g., J.B. Williams Co. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187, 191 (9th Cir.1975) (five factor test to determine likelihood of confusion) *cert. denied*, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976); *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979) (eight factor test). However, the district court was not required to consider all these factors. As we recognized in *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521 (9th Cir. 1984):

> [I]n granting a preliminary injunction, the parties will not have had a full opportunity to either develop or present their

cases and the district court will have had only a brief opportunity to consider the different factors relative to the likelihood of confusion determination.... The appropriate time for giving full consideration to [these factors] is when the merits of the case are tried.

*Id.* at 526 (citations and quotations omitted).

Peak has not shown how the district court clearly erred in its preliminary trademark conclusions. Accordingly, the district court did not abuse its discretion and this portion of the preliminary injunction is upheld.

### B. False Advertising

■ In granting the preliminary injunction, the district court found that "Peak's advertising ... falsely misleads the public as to Peak's capability of servicing and maintaining MAI computer systems." The injunction prohibits Peak from "advertising, directly or indirectly, that MAI Basic Four is part of Peak's Product line, that Peak has 'satellite facilities,' and/or that Peak's technicians are 'specifically trained on the latest hardware releases of MAI.'"

Peak argues that these representations in its ads are not false. However, the district court's findings are supported by the record. Depositions show that Peak is not an authorized MAI dealer, that its technicians receive no ongoing training and that its "satellite facilities" are actually storage sheds. Perhaps the storage sheds could be legitimately characterized as satellite facilities, but the district court's conclusion otherwise was not clearly erroneous. Accordingly, the district court did not abuse its discretion and this portion of the preliminary injunction is upheld.

## VIII. CONCLUSION

The following sections of the preliminary injunction issued by the district court on April 15, 1992 have been mooted by that court's issuing of a permanent injunction:

Section (A)(1), enjoining defendants from infringing MAI's copyrights; Section (A)(2) enjoining defendants from misappropriat-

ing MAI trade secrets; Section (A)(3) enjoining defendants from maintaining MAI computers; Section (A)(4) enjoining defendants from soliciting customers; and, Section (A)(5) enjoining defendants from maintaining certain customer contracts.

The remainder of the district court's preliminary injunction shall remain in effect pending the district court's final judgment. Earlier orders of this court temporarily staying portions of the injunction are vacated.

The permanent injunction issued by the district court on February 2, 1993, is vacated to the following extent:

Section (A)(2)(a), enjoining defendants from "misappropriating ... MAI's trade secrets" is vacated as it relates to MAI's software and MAI's Field Information Bulletins.

The remainder of the permanent injunction shall remain in effect. Earlier orders of this court temporarily staying portions of the injunction are vacated.

The district court's grant of summary judgment is AFFIRMED in part and REVERSED in part. This case is REMANDED for proceedings consistent with this opinion.