Victoria **AGUAYAO, Regional Director of the Twenty–First Region of the National Labor Relations Board, for and on the behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**QUADRTECH CORPORATION, Respondent.**

**No. CV 00–11039 CM MANX.**

United States District Court,
C.D. California.

Nov. 21, 2000.

Julie B. Gutman, Neial A. Warheit, William M. Pate, Los Angeles, CA, for petitioner.

Gregory G. Kennedy, Deborah H. Petito, Douglas H. Hoang, Goldstein, Kennedy & Petito, Los Angeles, CA, for respondent.

## ORDER GRANTING PRELIMINARY INJUNCTION

MORENO, District Judge.

The Court, having considered the moving papers, the opposition, and all further evidence and argument submitted in support of the parties' papers, *grants* the Petitioner's motion for a preliminary injunction.

### I. *Background*

The instant case concerns a labor dispute between Respondent Quadrtech, Inc. ("Quadrtech" or "Respondent") and Maria A. Venegas ("Venegas") and the International Union of Electronic, Electrical, Salaried, Machine Furniture Workers, AFL—CIO ("IUE" or "the Union"). Venegas and IUE have filed charges against Quadrtech in cases that are before the Petitioner, National Labor Relations Board ("NLRB" or "the Board"). The NLRB brings this case pursuant to 29 U.S.C. § 160(j). The NLRB petitions this Court to enjoin Respondent from relocating to Mexico pending resolution of the aforementioned labor dispute.

Respondent manufactures jewelry and piercing machines. In or about January 2000, Quadrtech opened shop in Gardena, California. It is alleged that Quadrtech's owner, Vladimir Reil ("Reil"), owns a jewelry company in Harbor City, California called Onyx. Prior to January, 2000, Reil's entire business operation was located in Harbor City. Respondent allegedly initiated a "lock-out" on May 18, 2000 following employee protests over working conditions. On May 18, 2000 Venegas filed a charge with the Board in Case 21–CA–339997. Also on May 18, 2000, IUE filed a petition with the Board for a union election at the Respondent's Gardena facility. The election was set for June 29, 2000.

Between May 18 and June 29, 2000, Respondent engaged in various activities to discourage Quadrtech employees from unionizing. The Petitioner alleges that Quadrtech's activities were unlawful. The Board submits voluminous affidavit evidence suggesting that, inter alia, Quadrtech's owner and agents interrogated Quadrtech employees as to their union sympathies and activities; threatened employees with job loss and reductions in benefits if they voted in favor of the Union; suggested the plant would relocate if employees voted in favor of the Union; and promised benefits to employees if they voted against the Union.

On June 29, 2000, the approximately 118 eligible unit employees at the Gardena facility voted in favor of the Union. On July 12, 2000, the Union was certified as the exclusive collective bargaining representative of the unit. On July 13, 2000, Respondent's attorney, Gregory Kennedy, dispatched a letter to the Union indicating that Quadrtech would be relocating certain production jobs to Mexico. The letter stated that, as a consequence of the relocation, Quadrtech would lay off up to 80 unit employees between November 3 and November 17, 2000. The letter articulates the Respondent's willingness to engage in "good faith" bargaining with the Union regarding the effects of Respondent's decision. Respondent did not in any way indicate prior to July 13, 2000 that it was planning to relocate. On July 13, 2000, the Union filed a charge against Quadrtech with the Board in Case 21–CA–34084.

The Board argues that if Respondent is not enjoined from relocating to Mexico, the NLRB's ability to adjudicate Cases 21–CA–33997 and 21–CA–34084 will be irremediably harmed.

## II. *Standard*

Section 10(j) of the NLRA, 29 U.S.C. § 160(j), authorizes the NLRB to petition United States district courts for injunctions against unlawful labor practices pending their adjudication before the Board. District courts are, in turn, empowered to grant injunctions where they appear "just and proper." [1] There is variation between circuits as to the standard for granting a Section 10(j) injunction. Until recently, the Ninth Circuit embraced a standard that was rather generous to the NLRB. *See Scott ex rel. NLRB v. El Farra Enters., Inc.*, 863 F.2d 670, 673–74 (9th Cir.1988) (promulgating a two-part test that first asked whether the Board had reasonable cause to believe the employer violated the NLRA and, second, whether an injunction was necessary to prevent frustration of the NLRA's remedial purpose); *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 747 (9th Cir.1988) (same). Other circuits continue to embrace this standard. *See, e.g., Kaynard v. Mego Corp.*, 633 F.2d 1026, 1033 (2d Cir.1980). *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 247 (3d Cir.1998).

The Ninth Circuit has overruled *Tomco* and *El Farra* and deployed a more stringent standard in their stead. *Miller v. California Pacific Medical Center*, 19 F.3d 449, 457 (1994) (en banc). This, more stringent standard, interprets Section 10(j)'s "just and proper" language through the lens of traditional equitable principles.[2]

---

**1.** 29 U.S.C. § 160(j) provides that:
The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

**2.** The traditional test requires "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest[.]" *Johnson v. California State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir.1995). Under the so-called "alternative test," a party seek-

*Miller,* however, does not instruct district courts to rely on traditional equitable principles as understood in non-labor contexts. Rather, the Ninth Circuit has instructed that lower courts apply traditional equitable principles in a manner that is ensitive to Section 10(j)'s primary purpose: "to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Id.* at 459–60. Section 10(j) seeks to "ensure that an unfair labor practice will not succeed because the Board takes too long ... to adjudicate the charge." *Id.* at 460.

This Court will not simply sign off on the Board's request for equitable relief. *Id.* at 458. The Board must demonstrate that it has at least a fair chance of winning its case on the merits. *Id.* at 460. The Court will determine whether the Board has met its burden in light of the Court's lack of jurisdiction over the unfair labor practice in question and the appellate deference accorded to NLRB determinations. *Id.* (citing *NLRB v. City Disposal Sys., Inc.,* 465 U.S. 822, 829, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984)). The Board can "make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge together with an arguable theory." *Id.*

If the Board demonstrates that it is likely to prevail on the merits, the Court shall presume that irreparable injury would result absent the preliminary injunction. *Id.* If the Board has only a fair chance of prevailing on the merits, the Court must consider the possibility of irreparable injury. *Id.*

### III. *Analysis*

#### A. *The Merits*

 The NLRB argues that Respondent's decision to relocate production facilities to Mexico violates Sections 8(a)(1), (3), and (5) of the NLRA. For reasons discussed below, the Court concludes that the NLRB is likely to prevail on its claim.

##### 1. *Defendant's Decision to Lay off Employees and Relocate*

 Section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3), defines an unfair labor practice by an employer as one which is discriminatory in a manner that discourages membership in a labor organization.[3] An employer may not relocate a plant in order to thwart the unionization of its workers. *See, e.g., NLRB v. Taylor Machine Products, Inc.,* 136 F.3d 507, 515 (6th Cir.1998). Courts have held that even where a relocation is lawful, an employer may not use it as a vehicle by which to rid itself of unionized employees. *See, e.g., Dunbar v. Colony Liquor and Wine Distr., LLC .,* 15 F.Supp.2d 223, 234 (N.D.N.Y. 1998).

---

ing preliminary injunctive relief must demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Stanley v. University of Southern California,* 13 F.3d 1313, 1319 (9th Cir.1994). Taken together, the two tests reflect "a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 516 (9th Cir.1993) (citations and internal quotation marks omitted).

**3.** Section 158(a)(1) provides that it shall be an unfair labor practice for an employer "to interfere with, restrain or coerce employees in

the exercise of the rights guaranteed in section 157 of this title."

Section 158(a)(3) provides that it shall be an unfair labor practice for an employer, "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ..."

Section § 158(a)(1), "is the blanket provision that shields employees from unfair labor practices. In most unfair labor practice cases, the Board has rested its decisions primarily on the particularized provisions of [158(a)(2)–(5) ]; in such cases, the Board has found that the employer has violated section [158(a)(1) ] only derivatively." *Microimage Display Div. Of Xidex Corp. v. NLRB,* 924 F.2d 245, 250 (D.C.Cir.1991).

Section 8(a)(3) only prohibits relocations that are motivated by unlawful intentions. Presently, the Respondent asserts that legitimate, economic concerns precipitated its decision to relocate. In ascertaining the relocation's cause, the NLRB has promulgated a standard based upon the Supreme Court's opinion in *Mt. Healthy City Sch. District Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977):

> First, we shall require that the General Counsel make a prima facie showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.

*Wright Line,* 251 NLRB 1083, 1089 (1980), enf'd 662 F.2d 899 (1st Cir.1981).

The Supreme Court has approved the NLRB's burden shifting scheme. *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 398, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).[4] In the course of affirming *Wright Line,* the Court also stated that Section 7(c) of the Administrative Procedure Act ("APA") "determines only the burden of going forward, not the burden of persuasion." *Id.* at 403–04 n. 7, 103 S.Ct. 2469. In *Director, Office of Workers' Compensation Programs v. Greenwich Collieries* 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994), the Court overruled this interpretation of Section 7(c). Section 7(c) does determine the "burden of persuasion," and thus requires that the burden perpetually remain with the action's proponent. Nevertheless, the *Greenwich* Court concluded that *Wright Line* was appropriate because it did no more than impose the burden of proving an affirmative defense on the employer. *Greenwich,* 512 U.S. at 278, 114 S.Ct. 2251. *Greenwich,* however, does suggest that the proponent must make a somewhat greater showing than just a prima facie one. *See Southwest*

*Merchandising Corp. v. NLRB,* 53 F.3d 1334, 1340 n. 8 (D.C.Cir.1995).

Presently, the NLRB has adduced considerable evidence indicating that anti-union animus motivated Quadrtech's decision to relocate to Mexico. First, the timing of Quadrtech's decision is suggestive. In January, 2000 Quadrtech moved its machinery and 118 employees from a facility in Harbor City, California to Gardena, California. Am.Pet.Exh. 8. The NLRB advances evidence suggesting that Quadrtech's owner, Vladmir Reil, invested significant time and money in the relocation. Numerous employees have testified that, a few weeks before the union election, Reil stated that he would not relocate the plant on account of having invested so much in the move from Harbor City. Am.Pet.Exhs. 12, 14, 32.

On May 18, 2000, the Union filed a petition for the Board to sanction a union election among Quadrtech's employees. Am.Pet.Exh. 35. Quadrtech chose not to contest any of the issues precluding or otherwise affecting the election. Rather, on May 25, 2000, it entered into a Stipulated Election Agreement. Am.Pet.Exh. 36. At no point prior to the union election did Quadrtech announce or otherwise suggest that it was planning a relocation that would result in a substantial reduction of its personnel. Yet, on July 13, 2000, one day after the Union was certified, Respondent, through its attorney, sent a letter to the Union announcing Quadrtech's plans to relocate production to Mexico. In the letter, Respondent stated that it would lay off up to 80 of the approximately 117 employees in the bargaining unit. Decl. Gregory G. Kennedy Exh. 1.

The timing of Quadrtech's announcement strongly supports the inference that anti-union animus motivated its relocation calculus. This inference is bolstered by evidence of an anti-union campaign orchestrated by the Respondents. The NLRB advances evidence that, up and until the

---

4. Section 7(c) provides that "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. S 556(d).

union election on June 29, 2000, Respondent, inter alia, engaged in the following conduct: 1) a two-and-a-half-day lock-out in May, 2000; Am.Pet.Exhs. 6, 10, 17, 19; 2) hiring "labor consultants" who, inter alia, told employees that the Union was malevolent and that the employees would receive less pay and benefits if they unionized; Am.Pet.Exhs. 8, 18, 24, 29; 3) through supervisors, individually and collectively threatening employees with discharge and reductions in pay and benefits if they voted for the union; Am.Pet.Exh. 15; and 4) that on the day before the union election, Reil, in a meeting with all day shift employees, stated that Quadrtech would not be able to compete if it had to pay higher wages; Reil also distributed a letter stating that there would be no retaliation against Union supporters if the Union lost; Am.Pet.Exhs. 7, 14, 32.

■ In its defense, Quadrtech states that its relocation decision was entirely predicated upon legitimate economic considerations.[5] Given imminent increases in California's minimum wage, Respondent contends that it simply will not be able to bear the competitive pressures of an increasingly "globalized" economy. In support of its argument, Respondent submits sundry articles and statements attesting to the competitive pressures generated by goods made outside the United States by low-wage workers. Respondent, however, submits scant empirical evidence as to its current and/or projected financial health. Rather, Quadrtech simply rests on the unsupported suggestion that spectral, low-wage Chinese workers haunt its business

related decision-making. The rhetoric of "cheap foreign labor" is a shibboleth that employers may not rely upon to justify unlawful, anti-union conduct. *See First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 682, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981) ("An employer may not simply shut down part of its business and mask its desire to weaken and circumvent the union by labeling its decision 'purely economic.'"). Quadrtech's evidence is perilously inadequate.

Respondent also argues that its allegedly anti-union activity was actually conduct protected by section 8(c) of the NLRA, 29 U.S.C. § 158(c). Section 8(c) permits employers to express their views regarding unionization provided that they do not threaten employees with any sort of reprisal.[6] The Supreme Court has stated that:

[A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a threat of reprisal or force or promise of benefit. He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. If there is any implication that an employer may or may not take action solely on his own initiative for

---

**5.** In oral argument, Respondent invoked similar logic in urging this Court, to the extent it is willing to enjoin Respondent at all, to do so only in a limited manner. In particular, Respondent urges this Court to enjoin Quadrtech from laying-off workers in the relevant bargaining unit (as opposed to enjoining the company from relocating its facilities). Respondent, however, cites no authority to suggest that this Court is precluded from enjoining an unlawful relocation. Nor does Respondent challenge Petitioner's assertion that the NLRB's adjudicatory purpose will be irremediably frustrated with anything less than

an injunction that does not preclude relocation.

**6.** In particular, Section 8(c) of the NLRA, 29 U.S.C. § 158(c), provides that:

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation....

*NLRB v. Gissel Packing, Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (citations omitted).

Quadrtech argues that statements made by its owner, Reil, to Quadrtech employees are protected by Section 8(c). Reil's statements to Quadrtech employees on June 21 and 28, 2000 are not outwardly threatening. They are, however, thick with suggestion. The NLRB adduces evidence indicating that Reil asked Quadrtech employees to consider the effects of unionizing in the same breath that he asserted a union shop's inability to compete against non-U.S. producers who rely upon low-wage workers. Reil exhorted Quadrtech employees to return home and look where their household appliances and wares had been made. Exhs. 7, 12, 14. The NLRB's evidence suggests that Reil's statements were menacingly portentous, in part, because they were uttered in the context of what was an on-going anti-union campaign.

Quadrtech also proffers thin evidence in support of its explanation for what the NLRB alleges to have been an unlawful lock-out. Respondent does not advance any significant argument or evidence concerning the other conduct constituting the anti-union campaign. In short, this Court finds it likely that the NLRB will succeed on the merits of its claims under Sections 8(a)(1) and (3). As such, the Court may presume that irreparable injury will result if this preliminary injunction is not granted.

#### 2. *Good Faith Bargaining*

■ Section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5), provides that it shall be unlawful for an employer to refuse to bargain collectively with its employees' representatives. Unions do not have a right to participate in employers' decision making as to whether or not to close a facility.

*First National* 452 U.S. at 681, 101 S.Ct. 2573. Employers, however, must bargain over the effects of a plant closure. *Id.* In this way, unions may indirectly ensure that closure decisions are deliberately considered. *Id.* Unions are also thereby able to protect themselves against plant closure decisions that are animated by anti-union sentiment. *Id.*

Presently, the NLRB contends that Quadrtech failed to bargain in good faith regarding the effects of its relocation decision. Quadrtech was required to bargain over its decision in a meaningful manner and at a meaningful time. *Id.* To the extent that Quadrtech's decision was unlawful, it is not clear that any bargaining gesture would have been adequate. That said, Respondent's "good faith" overture came in the form of a letter dated July 13, 2000, the day after the Union's certification. In the letter, Respondent's attorney announced Respondent's decision to relocate and consequential plans to terminate the majority of its workers at the Gardena facility.

■ The Respondent's letter is patently pro forma. It was dispatched in the immediate wake of the Union's certification. Moreover, the letter presents a prefabricated scheme for going about the termination. In short, Quadrtech's bargaining gesture seems to fall short of the "meaningful manner" and "meaningful time" requirements. The Court concludes that the Board is likely to succeed in proving a violation of Section 8(a)(5). As such no showing of irreparable injury is necessary.

#### B. *Balancing Equities*

For reasons stated above, the Court concludes that irreparable injury is likely to result if an injunction is not granted. Respondent asserts that it has already suffered substantially as a result of the Temporary Restraining Order this Court granted against it. Quadrtech's Mem. P & A 2. Quadrtech, however, adduces no meaningful evidence as to the dimensions of its suffering.

*Conclusion*

Pending final disposition of Cases 21–CA–3397 and 21–CA–34084 before the Board, the Court *grants* the following interim relief:

1. Quadrtech Corporation, its officers, representatives, agents, servants, employees, attorneys and all persons acting in concert with it are enjoined and restrained from:

(a) Refusing to recognize and bargain in good faith with District Council 8, IUE, the Industrial Division of the Communications Workers of America, AFL—CIO, CLC (IUE–CWA) as the exclusive bargaining representative of the Unit employees about wages, hours and other terms and conditions of employment of Unit employees, including, but not limited to, any decision to lay off employees, and/or to subcontract or relocate Unit work that is a mandatory subject of collective bargaining under the Act. The appropriate Unit is:

All full-time and regular part-time production and maintenance employees, bulk department employees, and shipping and receiving employees employed by Respondent at its facility located at 521 West Rosecrans Boulevard, Gardena, California; excluding all other employees, office clerical employees, professional employees, guards and supervisors as defined in the Act.

(b) Laying off or discharging Unit employees and subcontracting or relocating their work, or deciding to lay off or discharge Unit employees and to subcontract or relocate their work, in retaliation for employees' union activities and/or their selection of the Union as their collective-bargaining representative.

(c) Transferring, selling, relocating, removing, or otherwise alienating any of the assets, equipment, fixtures, inventory, supplies or work in progress involved in Unit work, pursuant to any relocation or subcontracting of Unit work from its Gardena, California facility in retaliation for employees' union activities and/or their selection of the Union as their collective-bargaining representative.

(d) Making implied threats to relocate its operations if employees choose the Union as their representative;

(e) Telling employees that Respondent decided to relocate its operations to Mexico because employees chose the Union as their representative;

(f) Threatening employees with stricter enforcement of work rules and discipline for mistakes, up to and including termination, if employees choose the Union as their representative;

(g) Threatening employees with loss of benefits if they choose the Union as their representative;

(h) Telling employees that union supporters are to blame for the stricter enforcement of work rules, loss of benefits, and other problems and changes at the Company;

(i) Threatening that it would be futile for employees to select the Union as their representative;

(j) Threatening employees with the inevitability of strikes if they choose the Union as their representative;

(k) Coercively interrogating employees about their Union support and sympathy and the Union support and sympathies of co-workers;

(*l*) Soliciting employee grievances in order to dissuade union support;

(m) Promising to confer benefits if employees abandon their support for the Union;

(n) Conferring benefits on employees to dissuade union support; and

(*o*) In any other manner interfering with, restraining or coercing its employees in the exercise of the rights guaranteed by Section 7 of the Act, 29 U.S.C. § 157.

2. Respondent, its officers, representatives, agents, servants, employees, attorneys, and all other persons acting in concert with it are affirmatively ordered to:

(a) Restore to the Gardena, California facility any Unit work which has been

 

subcontracted or relocated after July 13, 2000, as well as any equipment, fixtures, inventory, supplies and work in progress that have been relocated or subcontracted from that facility since July 13, 2000; and reinstate any employees who have been laid off pursuant to any removal of work from its Gardena, California facility after July 12, 2000.

(b) Within twenty (20) days from the date of this order, rescind any outstanding agreements to subcontract Unit work to Tijuana, Mexico;

(c) Recognize and bargain in good faith with District Council 8, IUE, the Industrial Division of the Communications Workers of America, AFL—CIO, CLC (IUE–CWA) as the exclusive collective-bargaining representative of the Unit employees about wages, hours and other terms and conditions of employment of Unit employees, including, but not limited to, any decision to subcontract or relocate Unit work from Respondent's Gardena, California facility that is a mandatory subject of bargaining under the Act.

(d) Post copies of the District Court's opinion and order, translated into Spanish, at Respondent's facility where Respondent's notices to its employees are customarily posted; these postings to be maintained for the duration of the Order, and to remain free of all obstructions and defacements;

(e) Grant reasonable access by the Regional Director's agents to Respondent's facility to monitor compliance with the posting requirements;

(f) Within twenty (20) days of the issuance of the order, file with the District Court, with a copy submitted to the Regional Director, a sworn affidavit from a responsible Respondent official setting forth with specificity the manner in which Respondent has complied with the terms of this decree.

3. That this case remain on the docket of this Court, and on compliance by Respondent with its obligations undertaken hereto, and upon final disposition of the matters pending before the Board, the Petitioner shall cause this proceeding to be dismissed.

IT IS SO ORDERED.