Cornele A. OVERSTREET, Regional Director of the Twenty–Eighth Region of the NATIONAL LABOR RELATIONS BOARD, for and on behalf of the National Labor Relations Board, Petitioner,

v.

GUNDERSON RAIL SERVICES, LLC, d/b/a Greenbrier Rail Services, Respondent.

No. CV 14–1323–TUC–FRZ.

United States District Court, D. Arizona.

Signed March 14, 2014.

Order Clarifying Injunction April 8, 2014.

Eva C. Shih, John T. Giannopoulos, Sophia Alonso, National Labor Relations Board, Phoenix, AZ, for Petitioner.

Frederick Charles Miner, Steven Gregory Biddle, Littler Mendelson PC, Phoenix, AZ, for Respondent.

## ORDER

FRANK R. ZAPATA, District Judge.

Pending before the Court is Petitioner's Petition for Temporary Injunction Under Section 10(j) [29 U.S.C. § 160(j)] of the National Labor Relations Act ("Act" or "NLRA").

The Respondent is Greenbrier Rail Services ("Greenbrier") which is a unit of the Greenbrier Companies, Inc. which manufactures, repairs, and services railroad cars throughout North America and Europe; the Wheels, Repair, and Parts division repairs and maintains rail cars at approximately 30 locations in North America. One of these locations is a Tucson facility that has approximately 92 production employees which includes welders, airmen, switchmen, painters, and others. Petitioner argues that in response to these employees attempting to unionize, Greenbrier engaged in an extensive anti-union campaign that included laying off a third of its work force, closing its Tucson factory, interrogation and the impression of surveillance of employees, unlawful promises and grants of benefits, unlawful solicitation of employee complaints and grievances, and threats to employees. Petitioner argues that these actions illegally destroyed any past and future support for unionization. While the parties have engaged in administrative litigation for many months and just completed numerous evidentiary hearings as to these issues before an Administrative Law Judge in February of 2014, Petitioner emphasizes that such administrative proceedings are protracted and an enforceable order typically is not forthcoming for an extended period of time. As such, Petitioner has filed this § 10(j) action seeking a temporary injunction from the Court pending the conclusion of the litigation before the Board. For the reasons stated below, Petitioner's Petition for a Temporary Injunction is granted.

## GENERAL STANDARD OF REVIEW

▓▓▓ "Section 10(j) permits a district court to grant relief it deems just and proper ... To decide whether granting a request for interim relief under Section 10(j) is just and proper, district courts consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction ... Thus, when a Regional Director seeks § 10(j) relief, he must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest ... [S]erious questions going to the merits' and a balance of hardships that tips sharply towards the [Regional Director] can support issuance of a preliminary injunction, so long as the [Regional Director] also shows that there is a likelihood of irreparable harm and that the injunction is in the public interest ... In all cases, however, the Regional Director must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction ... **[T]he court must evaluate the traditional equitable criteria through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power.**" *Frankl v. HTH Corp.,* 650 F.3d 1334, 1355 (9th Cir. 2011) [1] (emphasis added).

## LIKELIHOOD OF SUCCESS ON THE MERITS

▓▓▓ "On a § 10(j) petition, likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that this Court would grant a petition enforcing that order, if such enforcement were sought ... **[I]n evaluating the likelihood of success, it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals ... It is, after all, the Board and not the courts, which has primary responsibility for declaring federal labor policy ... Additionally, and for similar reasons, even on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel ... Given these considerations ... the regional director in a § 10(j) proceeding can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory ...** But if the Director does not show that success is likely, and instead shows only that there are serious questions going to the merits, then he must show that the balance of hardships tilts sharply in his favor, as well as showing that there is irreparable harm and that the injunction is in the public interest" *Frankl,* 650 F.3d at 1355–56 (emphasis added).

## § 8(a)(3) Allegations as to the November 2012 Layoffs

On 11/12/12, Greenbrier laid off approximately a third of its work force. Petitioner argues that this violated § 8(a)(3) of the Act as it was motivated by anti-union animus.

▓▓▓ "Section 8(a)(3) of the NLRA prohibits an employer from discriminating against employees in regard to hire or tenure of employment ... to discourage membership in any labor organization ... [I]t is well-established that an employer

---

1. Unless otherwise noted, internal quotes and citations have been omitted in relation to quoted authority throughout this Order.

violates Section 8(a)(3) of the NLRA where it close[s] a part of [its] operations, discharge[s] the employees involved, and subcontract[s] the work for anti-Union purposes." *Healthcare Employees Union, Local 399, Affiliated With Service Employees Intern. Union, AFL–CIO v. N.L.R.B.*, 463 F.3d 909, 918 (9th Cir.2006); *see also Nabors Alaska Drilling, Inc. v. N.L.R.B.*, 190 F.3d 1008, 1014 (9th Cir. 1999) ("An employer commits an unfair labor practice in violation of § 8(a)(1) & (3) if it discharges an employee because of the employee's union activity.").

■ In a Section 8(a)(3) case, the Board uses the burden-shifting scheme set forth in *Wright Line* to determine whether an employer was motivated by anti-union animus. *See* 251 NLRB 1083, 1089 (1980); *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 399–403, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (upholding *Wright Line* burden shifting scheme under the NLRA). Under *Wright Line*, Petitioner must show that employees were engaged in union activities, Respondent knew of these activities, and harbored the requisite anti-union animus. *Praxair Distribution, Inc.*, 357 NLRB No. 91 slip op. at 1 fn. 2 (2011), 2011 WL 4406047, *1. "Once this is established, the burden will shift to the employer to demonstrate the same action would have taken place even in the absence of the protected conduct." *Aguayo v. Quadrtech Corp.*, 129 F.Supp.2d 1273, 1277 (C.D.Cal.2000). An employer must not only establish a legitimate reason for its actions, but must persuade by a preponderance of the evidence, that it would have taken the same actions even in the absence of the protected activity. *Peter Vitalie Co., Inc.*, 310 NLRB 865, 871 (1993); *Healthcare Employees Union, Local 399 v. NLRB*, 463 F.3d 909, 923 (9th Cir.2006). The Petitioner's overall burden of persuasion is identical to its initial burden under *Wright Line. Manno Electric, Inc.*, 321

NLRB 278, 280 n. 12 (1996), enf'd mem., 127 F.3d 34 (5th Cir.1997).

■ "While the General Counsel retains the ultimate burden of persuasion, once the General Counsel establishes that anti-union animus was a motivating factor, the employer bears the burden of establishing any affirmative defense such as the inevitability of termination." *Healthcare Employees Union, Local 399, Affiliated With Service Employees Intern. Union, AFL–CIO*, 463 F.3d at 919. "An employer will seldom admit that it was motivated by anti-union animus when it made its adverse employment decision ... Actual motive, a state of mind, being the question, it is seldom that direct evidence will be available that is not also self-serving ... For that reason, circumstantial evidence is sufficient to establish anti-union motive ... Motive is a question of fact, and the NLRB may rely on both direct and circumstantial evidence to establish an employer's motive, considering such factors as the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action ... To determine motive, the Board may rely on indirect evidence and inferences reasonably drawn from the totality of the circumstances." *Id.* A discriminatory motive may be shown by: (1) the timing; (2) the presence of other unfair labor practices; (3) statements and actions showing the employer's general and specific animus; (4) disparate treatment; (5) departure from past practice; (6) failing to adequately investigate whether the alleged misconduct occurred; and (7) evidence demonstrating that an employer's proffered explanation for the adverse action is a pretext. *See, e.g., Golden Day Schools v. NLRB*, 644 F.2d 834, 838 (9th Cir.1981); *NLRB v. Rain–Ware, Inc.*, 732 F.2d 1349, 1354 (7th Cir.1984); *Mid–Mountain Foods, Inc.*, 332 NLRB

251, 251 n. 2, 260 (2000); *NLRB v. Vemco, Inc.*, 989 F.2d 1468, 1473–74 (6th Cir. 1993); *Affiliated Foods, Inc.*, 328 NLRB 1107, 1107 (1999); *Naomi Knitting Plant*, 328 NLRB 1279, 1283 (1999); *JAMCO*, 294 NLRB 896, 905 (1989), aff'd mem., 927 F.2d 614 (11th Cir.1991), cert. denied, 502 U.S. 814, 112 S.Ct. 66, 116 L.Ed.2d 41 (1991); *W.W. Grainger, Inc. v. NLRB*, 582 F.2d 1118, 1121 (7th Cir.1978); *Wright Line*, 251 NLRB at 1089; *Roadway Express*, 327 NLRB 25, 26 (1998). In addition, the "Board has inferred unlawful motive where the employer's action is baseless, unreasonable, or so contrived as to raise a presumption of unlawful motive." *J.S. Troup Elec.*, 344 NLRB 1009, 1015 (2005); *see also Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir.1966) (an employer's "self-serving declaration [as to motive] is not conclusive; [one] may infer motive from the total circumstances ...."; where it is found that the employer's "stated motive for a discharge is false, [one] can infer that there is another motive. More than that, one can infer that the motive is one that the employer desires to conceal—an unlawful motive, at least where ... the surrounding facts tend to reinforce that inference.").

 Petitioner has met his burden to show that the 11/12/12 layoff was motivated by anti-union animus. Greenbrier's Tucson employees had been attempting to unionize for an extended period of time. For example, in the fall of 2011, employees sought representation from the United Transport Union ("UTU"). Employees Rogelio Martinez and Jorge Martinez were actively involved in attempting to get their coworkers to vote for the UTU. Although it was common for employees to solicit one another during working hours (i.e., kids' fundraisers-band, Girl Scouts), talk about non-work related matters (family, kids, sports, politics), and employees were not disciplined for such action, both Rogelio

and Jorge both received written discipline for soliciting coworkers about the UTU during work hours. Another employee was told by his supervisor to stay away from two employees involved with the Union, and that Greenbrier was going to get rid of those two employees. Prior to the 10/28/11 UTU election among employees, Greenbrier management held meetings with employees, expressed their opposition to the UTU, and stated that unionization could result in closure of the Tucson plant, layoffs, and transfer of employees to other states. The UTU lost the 10/28/11 election by 3 votes. Pursuant to governing law, another union election could not be held for a year.

In October of 2012, after the narrow 10/28/11 election loss, management was well aware that employees could start organizing another union campaign as the one-year expiration approached and expected such action. Employees such as Jorge Martinez, Murgia, and Ramos led the unionization efforts in the fall of 2012. These employees initially met with the United Food and Commercial Workers Union ("UFCW") on 10/24/12 regarding representation, and passed out and collected UFCW authorization cards at the Tucson plant for their coworkers for a couple of days after the 10/24/12 meeting. In this short time, they collected 48 cards which was already a majority of the 92 production employees in Tucson. During the time frame that Martinez was in the process of passing out and collecting UFCW cards, he went to the front-shop of the plant for a work assignment, and while there, a supervisor (front-shop Foreman Martin Torres) asked if it was true that the union was coming around again; Martinez stated that he did not know, asked Torres why, to which Torres responded that rumors had been heard.

In the beginning of November, Martinez and his colleagues decided that the Sheet Metal Workers union ("SMW") would better represent their interests as they had more experience in their field; as such, they decided to seek representation from the SMW instead of the UFCW. They met with the SMW on 11/5/12, and began passing out and collecting SMW authorization cards from their co-workers the next day at the Tucson plant. Martinez told his co-workers to read the cards and sign it if they agreed; he witnessed their signatures and placed his initials on them. The signed authorization cards state in part: "I, the undersigned, hereby authorize the SHEET METAL WORKERS INTERNATIONAL ASSOCIATION ... to represent me for purposes of Collective Bargaining, and in my behalf, to negotiate and conclude all agreements as to hours of labor, wages, and other conditions of employment." When passing out cards, Ramos explained to his co-workers that by signing the card they agreed to be represented by the Union; likewise, Murgia told his co-workers to read the card carefully and sign it if they agreed. There was testimony that employees believed that by signing the cars, the Union would represent them. By 11/8/12, Martinez and his colleagues had already collected 50 SMW authorization cards which again was a majority of the 92 production employees in Tucson.

On 10/31/12, Al Lave (Vice President of Human Resources) led a meeting with Tucson management (shop managers, supervisors, and leadmen along with Plant Manager Lex Morrison and Human Resources representative Margaret Madrigal) regarding renewed unionization efforts among employees in Tucson. Lave instructed management to monitor their respective work areas and bring any union materials they find to the plant manager. On the day of the layoffs, less than two weeks after this management meeting regarding unionization, Tucson Foreman Martin Torres stated to one of the employees that was terminated (Guillermo Murgia) that he thought the layoffs were because of the Union. One of the leads in the meeting was Armando Lopez; Lopez was a friend of the primary union organizer among employees (Jorge Martinez), and Martinez would keep Lopez updated on the union drive such as how many union authorization cards were collected. Likewise, on a daily basis in the months before the November 2012 layoff, Gutierrez would talk about unionization issues with leads Luis Lopez and Ismael Lopez; this group often carpooled to work together.

On 11/12/12, Greenbrier laid off 28 employees from the Tucson plant which constituted about a third of the work force. The close timing between the layoff and the employees' unionization efforts and collection of a majority number of union authorization cards supports a finding of Greenbrier's anti-union animus. *See Golden Day Schools, Inc. v. NLRB*, 644 F.2d 834, 838 (9th Cir.1981) (timing of discharge was indicia of discriminatory motive); *Healthcare Employees Local 399 v. NLRB*, 463 F.3d 909, 920 (9th Cir.2006) (timing of employer's subcontracting decision, between filing of election petition and date of election, made inference of anti-union motive "stunningly obvious"). Likewise, Greenbrier's anti-union animus is also shown through the various violations of the Act discussed throughout this Order. Petitioner has met its burden to show that anti-union animus was a motivating factor in laying off a third of its work force. The burden shifts to Respondent to show that the same action would have been taken even in the absence of the renewed unionization efforts.

In response, Greenbrier primarily argues that the 11/12/12 layoffs occurred solely for legitimate economic considerations. For example, Greenbrier argues

that the Tucson plant had been extremely inefficient since it unexpectedly lost a large number of experienced employees and supervisors in an IRS employee false identification audit in 2011. Since that time, less experienced workers were inefficient inasmuch as they physically worked and were paid by Greenbrier for many more hours than they could bill their customers (i.e., most repair jobs had a maximum number hours that could be billed to the customer, but employees were often exceeding these maximum hours, were still paid by Greenbrier for the time they were physically on duty at the plant, but the extra costs to Greenbrier could not be passed on to the customer receiving the repairs). As such, in light of these extreme inefficiencies, the Tucson plant started losing money, attempted to hire and train more workers to increase efficiency to no avail, lost more money as they worked longer due to these inefficiencies, and Greenbrier ultimately lost approximately $250,000 in October of 2012. These economic issues were the sole basis for ultimately deciding to lay off Tucson employees on 11/12/12.

Petitioner argues that Respondent's position is pretext, and points to numerous factors that call its justification into doubt. Petitioner emphasizes that for many months, and even years, the Tucson shop lost money in some months and made a profit some months. Then after the unionization efforts began resurfacing in October and November of 2012, Greenbrier abruptly decided to lay off a third of their Tucson work force. Furthermore, less than two months before the layoffs, upper management was criticizing Tucson management and demanding an explanation for failing to hire enough workers to meet hiring goals for Tucson (the Tucson shop was supposed to expand to 95 employees, but only had 73 employees in August of 2012). In the first weeks of November, Greenbrier was still trying to hire welders

in Tucson. As to the month of October, there were numerous one-time expenses in Tucson that contributed to the larger losses such as the death of an employee causing the factory to close, and the introduction of a new accounting system ("Syspro") which resulted in numerous inaccuracies in financial statements in the months leading up to the November layoffs. In addition, there were two other Greenbrier locations (Dothan and Atchison) that had large losses as of 11/1/12, but there was no sudden decision to layoff a third of those workforces in contrast to Tucson.

There also is a substantial amount of conflicting and vague testimony from management relating to the November layoffs. *See Maywood, Inc.*, 251 NLRB 979, 993–994 (1980) (inconsistent testimony from company witnesses as to who made decision to discharge employee and the reason for the discharge is evidence of pretext to hide the real reason, advocacy for the union); *Cf. Planned Building Services, Inc.*, 347 NLRB 670, 713–15 (2006) (in a refusal-to-hire case, inconsistent testimony as to who made decision to not hire employees supports a finding of pretext); *Jennings & Webb, Inc.*, 288 NLRB 682, 687–88 (1988), enf'd., 875 F.2d 315 (4th Cir.1989) (Table) (conflicting and inconsistent testimony from employer's witnesses, including as to when the decision to terminate employee was made, supports a finding of discriminatory intent); *Black Entertainment Television, Inc.*, 324 NLRB 1161, 1161 (1997) ("The Board has long expressed the view that when an employer vacillates in offering a rational and consistent account of its actions, an inference may be drawn that the real reason for its conduct is not among those asserted."). For example, Mike Torra from upper management (who gave final approval for the layoffs) could not recall when the need for a layoff was first discussed, who raised the topic, who discussed the topic, and stated that the

need for the layoff was generally a process issue. While Torra gave final approval, regional managers Kevin Stewart and Juan Maciel were the ones who decided that there needed to be a layoff in Tucson, and were responsible for deciding how many people and who should be laid off. Stewart stated that he raised the need for layoffs in late October in a conference call, and that he was directed by his superiors to come up with a plan (along with Maciel) for fixing the Tucson situation, and to be ready to present the plan at Greenbrier's annual managers' conference in Chicago from 11/5/12 to 11/7/12. He stated that he consulted with Maciel prior to the conference, and they presented a plan during the conference. In contrast, Maciel (who was the joint decision maker with Stewart regarding the Tucson layoffs), stated that he learned about the layoffs for the first time while he was at the conference, and he discussed the layoff plan with Stewart after the conference started. As to choosing what employees to layoff, the factors they used in making their decisions were skill and ability, productivity, safety record, cross-training, and seniority. However, they ultimately never reviewed any performance reviews, attendance records, or other documents in deciding who they laid off. Stewart also testified that he was not familiar enough with the Tucson employees to place a name with a face, so he relied on Maciel to tell him names of who to retain and who to layoff. However, Maciel had not worked in Tucson for over 12 years and was brought in to help deal with the layoffs. Maciel, in turn, stated that he relied in part on Tucson production manager Freddy Valdez as to who to layoff or retain as he was very familiar with the Tucson employees. However, Valdez stated that nobody spoke to him about who to retain or layoff prior to the actual layoffs on 11/12/12, and the first time he learned of the layoffs was when they announced the layoffs to the entire plant on 11/12/12.

There is also evidence that there were employees that were laid off who had higher performance evaluations than some of those retained.

In further support of the finding that Greenbrier's justification is pretext, Petitioner emphasizes that Greenbrier inexplicably decided in January of 2013 to start rehiring the employees they just laid off. The reasons for the layoff included skill, ability, and productivity for the purpose of having more efficient employees to increase Greenbrier's profits in Tucson. However, a couple of months later, Greenbrier decided to start rehiring these same former employees. The employees that were just laid off were required to submit a new employment application, interview with the new plant manager (Eric Valenzuela), and management and human resources were directed to keep track of such things as their attitudes, and whether they would present further issues to Greenbrier. Valenzuela mentioned during one such interview that the unionization efforts "may or may not have" contributed to the layoffs, and that employees wasted time at work related to union activities that made the efficiency and economic situation in Tucson worse. Both Stewart and Maciel decided in mid-January of 2013 to start rehiring laid off employees because labor utilization rates (measuring employee efficiency) were acceptable. Stewart stated that labor utilization rates between 60–80% were acceptable, but the rates in December 2012, January 2013, and February 2013 were all below 60%, and rates were at 46% in January 2013 when the decision was made to start rehiring people. In rehiring former employees, Stewart and Maciel focused on the particular skill sets needed, and again stated they relied in part on feedback from Tucson production manager Freddy Valdez in determining who to rehire. However, Valdez said he was never consulted about who should be

rehired, and was only told after the fact that Greenbrier was recalling employees.

Based on the record before the Court, Petitioner has shown that he is likely to prevail on his position regarding the § 8(a)(3) claims pertaining to the 11/12/12 layoffs.

### § 8(a)(3) Allegations Pertaining to Closure of the Tucson Shop

After the layoffs in November of 2012, the decision to rehire employees in January of 2013, and the rehiring of numerous laid off employees for the first several months of 2013, Greenbrier decided in August of 2013 that the Tucson shop had to be closed with operations winding down for several months thereafter. Like the layoffs, Petitioner argues that Greenbrier was motivated by anti-union animus to close the facility to dissuade union support throughout its organization.

 The *Wright Line* burden-shifting standard also applies to the evaluation of whether the employer's decision to close a facility and move the work to another facility was motivated by anti-union animus. *See Aguayo ex rel. N.L.R.B. v. Quadrtech Corp.*, 129 F.Supp.2d 1273, 1277 (C.D.Cal. 2000); *see also Healthcare Employees Union, Local 399, Affiliated With Service Employees Intern. Union, AFL–CIO*, 463 F.3d at 918 ("Section 8(a)(3) of the NLRA prohibits an employer from discriminating against employees in regard to hire or tenure of employment ... to discourage membership in any labor organization.").

The record reflects that Greenbrier was aware of the employees unionizing activities (which culminated in the July 2013 elections as to the SMW union), and that Greenbrier had an anti-union animus. Like the layoffs, the timing of the decision to close the Tucson plant in August of 2013 supports an anti-union motive. Likewise, Greenbrier's anti-union animus is also shown through the various violations of the Act discussed throughout this Order. In May of 2013, Greenbrier received notice that the upcoming SMW union election was going to proceed. Later, in July of 2013 [2], only a couple of weeks after the July 2013 election whereby the union was again defeated (by a wide margin this time), Greenbrier proposed a large rate increase of approximately 18% to its largest Tucson customer (TTX—which accounted for approximately 70–80% of the business in Tucson). TTX, however, had a very large, nationwide fleet of railcars that could receive the same repairs at other Greenbrier facilities in Mira Loma, California and San Antonio, Texas at much lower rates thereby saving TTX a substantial amount of money. Thus, TTX rejected Greenbrier's large rate increase for Tucson, stopped sending work to Tucson, and redirected their business to Mira Loma and San Antonio. In response, Greenbrier immediately decided in August of 2013 to close the Tucson facility. As Petitioner has met its initial burden to show that anti-union animus motivated the closure, the burden shifts to Greenbrier to show that it would have closed the facility regardless of the unionization activities.

2. Shortly before the July 2013 election, management held captive-audience meetings with Tucson employees in June and July of 2013 where threats regarding their job security were made. For example, management told employees that their single largest customer (TTX) was adverse to unions, sends railcars to Tucson because its non-union, that there was a risk that TTX would stop sending railcars to Tucson if it unionized, that the Tucson shop could close due to the problems caused by unions especially in light of Tucson's recent problems, and that Greenbrier was being forced to spend large amounts of money on attorneys' fees defending against the Union's unfair labor practice allegations at a time when the Tucson shop is struggling to make a profit to remain open.

Greenbrier argues that the closure of the Tucson facility was motivated by purely economic reasons based on the fact that Tucson's largest customer independently decided to stop sending work to Tucson. Without their largest customer, there was simply no way that the Tucson plant could survive. Furthermore, Greenbrier argues that it was receiving substantial pressure from Wall Street to increase profits; this necessitated the new rate proposal to TRX which did increase rates on the current volume of TRX work sent to Tucson, but gradually decreased rates if TRX agreed to send more volume of work to Tucson. Greenbrier argues that if TRX agreed to send a greater volume of work to Tucson, it would have benefitted both Greenbrier and TRX. However, TRX independently rejected the proposal and decided to stop sending work to Tucson which forced the closure of the plant due to lack of work.

Petitioner argues that the evidence reflects that Greenbrier's justification is a pretext. Prior to the 7/22/13 meeting with TRX proposing increased rates, Tucson was profitable every month in 2013. In the Company-wide 2013 Greenbrier "Rationalization Plan" documents seeking to improve its many business entities around the country and improve profits in 2013, Tucson was consistently labeled as a plant to "fix" throughout April, May, and June. In contrast, the San Antonio plant was consistently labeled as a plant to "close." In July, near the time that Greenbrier received notice from the NLRB regarding a hearing as to unfair labor practice charges related to the July election, the July Greenbrier Rationalization Plan mentioned unionization issues; Plans from previous months did not mention unionization. In addition, the July Plan also stated that without a new rate structure with TRX, the Tucson plant would likely close by the end of the year; Plans from previous months never tied the longevity of the Tucson plant to a new rate structure with TRX. At the 7/22/13 meeting with TRX regarding the rate changes, upper management from Greenbrier (including President William Glenn) outlined their position which included a PowerPoint presentation. The presentation stated that they were under pressure to fix, close, or sell underperforming Greenbrier entities and to otherwise increase profits. The presentation also went on to outline numerous problems in Tucson including a history of poor management, inefficiency, longer than expected repair times, and then proposed a large rate increase on the current volume of work for TRX, and offered to drop prices only if TRX increased the volume of work. In response to this presentation, TRX declined to increase the volume of work to Tucson, and rejected the large rate increase. It also opted to have its railcars that were going to Tucson (which largely originated out of California which TRX discovered only after the Greenbrier presentation) rerouted to other Greenbrier facilities in Mira Loma, California and San Antonio, Texas. These two alternative Greenbrier facilities had much lower rates for the same Greenbrier repairs on the equivalent volume of work that TRX had previously sent to Tucson. Based on the same volume of TRX work going to Tucson, TRX would pay an extra $785,000 a year based on the new Tucson rates. However, sending the same volume of work to Mira Loma would save two million dollars a year, and would save one million dollars a year if sent to San Antonio. Upon receiving notice of TRX's decision in late August of 2013, Greenbrier immediately decided to close the Tucson facility without exploring other business options. There was testimony that other companies such as Brandt or Pacer were willing to send 40 to 50 railcars to Tucson for maintenance and repair within a couple of weeks to provide more business, but Greenbrier did not pursue these options.

When a TRX executive delivered the news to Greenbrier President William Glenn that TTX would no longer send work to Tucson and would instead be sending that work to Mira Loma and San Antonio, President Glenn "appreciated [TTX] finding a solution that enables Greenbrier to close Tucson."

Based on the record before the Court, Petitioner has shown a likelihood of success as to his § 8(a)(3) claims regarding the closure of the Tucson plant.[3]

### Termination of Juan Silva

Under the *Wright Line* burden-shifting standard, Petitioner has also shown a likelihood of success as to the allegation that employee Juan Silva was unlawfully fired in retaliation for his Union activities. *See Masland Industries,* 311 NLRB 184, 197 (1993); *NLRB v. Rain–Ware, Inc.,* 732 F.2d 1349, 1354 (7th Cir.1984).

Silva strongly supported unionization, and constantly talked about the Union with Tucson leadmen such as Ismael Lopez. On 5/30/13, Ismael Lopez observed Silva working with a piece of equipment (an EOCC unit), told him that he failed to follow required safety procedures as to the unit, and this was reported to the plant manager who fired Lopez the same day. Greenbrier had knowledge that Silva supported the Union, and the anti-union animus is supported by the various violations of the Act discussed herein. Greenbrier argues that Silva was fired solely for safety reasons. For example, Silva had received several recent trainings on safety procedures for the EOCC unit, expressed

his disagreement with the procedures, and shortly thereafter intentionally (unlike other employees who engaged in similar conduct) violated such procedures which led to his firing. However, as Petitioner argues, there is evidence that Silva was working alongside his co-worker (Brian Skaggs) that day, and that Skaggs was the one that was actually responsible for carrying out the safety procedures as to the EOCC unit. However, Skaggs was only suspended for his safety violation, while Silva was terminated. In addition, another employee that had violated safety procedures as to the EOCC only received a written warning. Silva was the only employee in Tucson fired for violating these procedures. Petitioner has shown a likelihood of success that Greenbrier violated the Act by firing Silva in retaliation for his Union activities.

### § 8(a)(1) Allegations

In the midst of the layoffs and plant closure, Petitioner also argues that Greenbrier engaged in numerous § 8(a)(1) violations as part of its anti-union campaign which also had the effect of dissuading unionization activity in this case.

Section 8(a)(1) of the NLRA [29 U.S.C. § 158(a)(1)] states that it "shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." Section 7 of the NLRA [29 U.S.C. § 157] states: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively

---

**3.** The *Wright Line* burden-shifting standard likewise applies to the evaluation of whether the employer violated § 8(a)(4) of the NLRA pertaining to whether the closure of the Tucson shop was motivated by anti-union animus. *See NLRB v. Overseas Motor, Inc.,* 721 F.2d 570, 571 (6th Cir.1983); *American Gardens Mgt. Co.,* 338 NLRB 644, 645 (2002); *see also* § 8(a)(4) of the NLRA [29 U.S.C.

§ 158(a)(4)] ("It shall be an unfair labor practice for an employer ... to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter."). For the reasons discussed in the text, Petitioner has shown a likelihood of success as to the § 8(a)(4) claims as to the closure of the Tucson plant.

through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ..." *See also In re American Tissue Corp.*, 336 NLRB 435, 441 (2001) ("Section 8(a)(1) of the Act provides that it shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their statutory right to engage in, or restrain from engaging in concerted activity.").

■■■ "It is well settled that the test of interference, restraint, and coercion under Section 8(a)(1) of the Act does not turn on the employer's motive or on whether the coercion succeeded or failed. The test is whether the employer engaged in conduct, which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act ... In making the requisite determination, the Board considers the total context in which the challenged conduct occurs and is justified in viewing the issue from the standpoint of its impact on the employees." *Id.* at 441–42. "However, this provision is modified by Section 8(c) of the Act, which defines and implements the first amendment right of free speech in the context of labor relations ... Section 8(c) permits employers to express 'any views, arguments or opinions' concerning union representation without running afoul of Section 8(a)(1) of the Act if the expression 'contains no threat of reprisal or force or promise of benefit.' ... The employer is also free to express opinion or make predictions, reasonably based in fact, about the possible effects of unionization on its company ... In determining whether questioned statements are permissible under Section 8(c), the statements must be considered in the context in which they were made and in view of the totality of the employer's conduct ... Also recognized must be the economically dependent relationship of the employees to the em-

ployer and the necessary tendency of the former, because of the relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Id.* at 442.

## § 8(a)(1): Interrogation and the Impression of Surveillance

■■■ Petitioner argues that Greenbrier unlawfully interrogated and created an impression of surveillance when employee Jorge Martinez was confronted by a supervisor and asked questions about unionization in October of 2012.

■■■ The totality of the circumstances are weighed in determining whether management's questioning of an employee is coercive in violation § 8(a)(1); among the factors considered are: "(1) The background, i.e., is there a history of employer hostility and discrimination? (2) The nature of the information sought, e.g., did the interrogator appear to be seeking information on which to base taking action against individual employees? (3) The identity of the questioner, i.e., how high was he in the company hierarchy? (4) Place and method of interrogation, e.g., was employee called from work to the boss's office? Was there an atmosphere of unnatural formality? (5) Truthfulness of the reply." *See Westwood Health Care Center*, 330 NLRB 935, 939 (2000). "These and other relevant factors are not to be mechanically applied in each case ... [D]etermining whether employee questioning violates the Act does not require strict evaluation of each factor; instead, [t]he flexibility and deliberately broad focus of this test make clear that [these] criteria are not prerequisites to a finding of coercive questioning, but rather useful indicia that serve as a starting point for assessing the totality of the circumstances ... In the final analysis, our task is to determine whether under all the circumstances the

questioning at issue would reasonably tend to coerce the employee at whom it is directed so that he or she would feel restrained from exercising rights protected by Section 7 of the Act." *Id.* at 939–40.

 "Employer surveillance or creation of an impression of surveillance constitutes unlawful interference with Section 7 rights because employees should feel free to participate in union activity without the fear that members of management are peering over their shoulders ... An employer creates an impression of surveillance when the employee would reasonably assume from the [employer's] statement that [his] union activities had been placed under surveillance ... In general, the Board finds that this test has been met when an employer reveals specific information about a union activity that is not generally known, and does not reveal its source. Under such circumstances, employees may reasonably conclude that the information was obtained through employer monitoring." *New Vista Nursing and Rehabilitation, LLC*, 358 NLRB No. 55 slip op. (2012), 2012 WL 2561650 *15; *see also Heartshare Human Services of New York*, 339 NLRB 842, 844 (2003) ("In order to establish an impression of surveillance violation, [Petitioner] bears the burden of proving that the employees would reasonably assume from the statement in question that their union activities had been placed under surveillance."); *Flexsteel Industries*, 311 NLRB 257, 257 (1993) ("The idea behind finding an impression of surveillance as a violation of Section 8(a)(1) of the Act is that employees should be free to participate in union organizing campaigns without the fear that members of management are peering over their shoulders, taking note of who is involved in union activities, and in what particular ways. We have never required ... evidence that management actually saw or knew of an employee's union activity for a fact, nor do we require evidence that the employee intended his involvement to be covert or that management is actively engaged in spying or surveillance. Rather, an employer creates an impression of surveillance by indicating that it is closely monitoring the degree of an employee's union involvement.").

As referenced above, shortly before the layoffs in November of 2012, employee Jorge Martinez (who was leading unionization efforts) was distributing and collecting UFCW cards from coworkers at the Tucson plant. During this time frame, when Martinez went to the front-shop to request work, Tucson front-shop Foreman Martin Torres asked him if it was true that the "union was coming around again." Martinez stated that he didn't know, and asked why he was inquiring. Torres responded that there were "rumors ... that had been heard." Petitioner argues that this questioning of Martinez violated section 8(a)(1).

As Petitioner emphasizes, Torres was the foreman of the front-shop and only one of four foremen at the facility. He directly asked Martinez about unionization at a time when Martinez was spearheading unionization efforts and passing out and collecting union cards. Also, although Martinez only went to the front shop to request work, Torres took that opportunity to question him about the union. The coercive nature of the questioning is reflected by Martinez's response that "he didn't know" whether the union was coming around again even though Martinez was a lead organizer who was distributing and collecting union authorization cards. Furthermore, as referenced earlier, Martinez had been disciplined by Greenbrier in relation to soliciting in support of the 2011 union campaign even though it was common for employees to solicit and talk to coworkers about non-work issues during work time, and they were not disciplined. Petitioner has shown a likelihood of suc-

cess as to its allegation that Martinez was interrogated in violation of § 8(a)(1). In addition, Petitioner has also shown a likelihood of success that this same conduct created an unlawful impression of surveillance in violation of § 8(a)(1).

### § 8(a)(1): Surveillance of Union Activity

■■■ In April of 2013, after the layoffs and prior to the new election and plant closure, Petitioner argues that plant manager Eric Valenzuela engaged in unlawful surveillance in violation of § 8(a)(1) when he approached Union representatives' handbilling employees as they were arriving to work; he stayed in the area until they left the property and observed employees talking to Union representatives and taking flyers. Petitioner cites one case in support of its position on these issues. *See DHL Express, Inc.,* 355 NLRB 680, 680 n. 2 (2010) (employer "engaged in unlawful surveillance by standing among or near [union] handbillers while police investigated the presence of nonemployee union agents on the edge of the [employer's] premises ... There is no evidence of disruptive behavior by the handbillers, or that they posed any threat to the police investigation ... [T]he prolonged presence of the [employer] among the handbillers was unusual, out of the ordinary, and unconnected to [any] legitimate concerns of the [employer]."). Unlike *DHL Express, Inc.,* based on the record cited by the parties, it appears that the handbillers in this case were on Greenbrier's property, were potentially causing a safety hazard, and management approached them for a brief period regarding this issue. The handbillers were passing out flyers around four in the morning when it was very dark, they were handing out the flyers as employees were driving into the Greenbrier parking lot causing a traffic jam, and there were some near misses between the handbillers and the cars arriving due to lighting conditions.

As such, management approached the handbillers for a brief period to discuss the safety problem and to ask them to leave; the incident was later reported to the police. Petitioner has not shown a likelihood of success as to this issue.

### § 8(a)(1): Promises and Grants of Benefits

Petitioner argues that Greenbrier granted certain benefits to employees which had the effect of dissuading union activity in violation of the Act.

■■■ "The conferral of employee benefits while a representation election is pending, for the purpose of inducing employees to vote against the union, [interferes with] the protected right to organize [under § 8(a)(1) of the NLRA]." *N.L.R.B. v. Exchange Parts Co.,* 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). "The broad purpose of s 8(a)(1) is to establish the right of employees to organize for mutual aid without employer interference ... [I]t prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect ... The action of employees with respect to the choice of their bargaining agents may be induced by favors bestowed by the employer as well as by his threats or domination ... The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." *Id.* at 460. "The danger may be diminished if ... the benefits are conferred permanently and unconditionally. But the absence of conditions or

threats pertaining to the particular benefits conferred would be of controlling significance only if it could be presumed that no question of additional benefits or renegotiation of existing benefits would arise in the future; and, of course, no such presumption is tenable ... [I]n most cases of this kind [of] increase in benefits could be regarded as one part of an overall program of interference and restraint by the employer." *Id.*

 "Other unlawful conduct may often be an indication of the motive behind a grant of benefits while an election is pending, and to that extent it is relevant to the legality of the grant; [A]n employer is not free to violate s 8(a)(1) by conferring benefits simply because it refrains from other, more obvious violations ... The beneficence of an employer is likely to be ephemeral if prompted by a threat of unionization which is subsequently removed. Insulating the right of collective organization from calculated good will of this sort deprives employees of little that has lasting value." *Id.; see also Jewish Home for the Elderly of Fairfield County,* 343 NLRB 1069, 1088–89 (2004) ("Although the Board has held that the grant of benefits during an election campaign is not per se unlawful, the Board will draw an inference of improper motivation and interference with employee free choice where the evidence shows that employees would reasonably view the grant of benefit as an attempt to interfere with or coerce them in their choice of representative ... [T]he Board [has also] held that the timing of an employer's announcement of wage increases during a union campaign may be unlawful even if the wage increase itself does not violate the Act."); *Pacific Coast M.S. Industries Co., Ltd.,* 355 NLRB 1422, 1422 (2010) (finding a violation of Section 8(a)(1) where the employer "failed to demonstrate that it had crystallized its wage increase decision before it learned of the union activity or that the grant would have

occurred if the Union had not been on the scene."); *Evergreen America Corp.,* 348 NLRB 178, 180 (2006) (finding that grants of benefits which included wage increases, improvements to sick leave and attendance policies, implementation of flexible work schedules, expansion of the casual dress policy, and permitting employees' spouses and guests to attend the company holiday party constituted unlawful benefits in violation of the Act; noting that such unlawful grants of benefits may have "a particularly longlasting effect on employees and are difficult to remedy ... because of their significance to the employees ..."); *Holly Farms Corp.,* 311 NLRB 273, 274 (1993) ("[W]e draw an inference of improper motivation and interference with employee free choice [as to the employer's grant of benefits] from all the evidence presented and from the [employer]'s failure to establish a legitimate reason for the timing of the [wage] increase.").

Petitioner argues that Greenbrier's decision to roll back attendance points violated § 8(a)(1). On 11/15/12, a few days after the layoffs, Greenbrier announced to the remaining Tucson employees that it would "zero out" their attendance points which would give them a totally clean slate as to attendance issues. The decision was made after Greenbrier was aware of the Union campaign, a few days after the layoffs, and shortly after the Union election petition was filed. Under Greenbrier policies, employees received negative points for absences, which included: a verbal warning for two points; a written warning for five points; a three day suspension for eight points, and getting fired for nine points.

In response, Greenbrier argues that it only rolled back attendance points during that time frame because it discovered that human resources officials in Tucson had made extensive mistakes in applying and recording attendance points. As such,

Greenbrier decided to roll back all the points to zero to rectify the problem. However, instead of rolling back all the attendance points to zero, Greenbrier could have corrected the inaccuracies as to the remaining employees such that their records accurately reflected their attendance history. In a meeting with employees shortly before the July 2013 election, management pointed out that rolling back the attendance points was an example of how employees benefitted from Greenbrier's flexibility to implement such actions, and that a Union could hamper such flexibility. Prior to 11/15/12, attendance points had never been rolled back to zero in Tucson. In addition, a regional human resources manager for Greenbrier (Lisa Maxey) testified that such a rollback had never occurred during her tenure for the eight facilities under her supervision. Petitioner has shown a likelihood of success as to a § 8(a)(1) violation regarding the roll back of attendance points.

Petitioner also argues that Greenbrier violated § 8(a)(1) when it increased the maximum pay rate for employees in February of 2013; employees were told the pay rate was being raised to increase efficiency, production, and for employee morale. However, it appears that the wage increase was consistent with Greenbrier's routine practice of raising rates at periodic times throughout the year. The wage increase was part of a Company-wide, routine wage increase that applied to hundreds of Greenbrier employees dispersed across the country in numerous locations other than Tucson. Petitioner has not shown a likelihood of success as to the pay raise in February of 2013.

Petitioner argues that Greenbrier's safety poker program violated § 8(a)(1). In April or May of 2013, prior to the July 2013 election, Greenbrier started a brand new safety poker game at the Tucson plant that awarded prizes to employees such as iPads and tools. For a period of approximately five weeks, employees would receive cards based on safety performance; at the end of the five weeks the three employees with the best hands would receive prizes. Greenbrier argues that the poker game was simply part of an effort to increase safety at the Tucson plant which had a horrible safety record. Due to this poor record, Greenbrier hired a new safety manager and the poker program was part of this overall goal to encourage safety in Tucson. The safety record in Tucson improved thereafter. However, in previous years, Tucson never had any such program where prizes were awarded. In addition, although there was testimony from the new safety manager that the results of the poker game were "awesome" insofar as improving safety in Tucson, the safety poker game was discontinued shortly after the July 2013 election. Petitioner has shown a likelihood of success that the safety poker games violated § 8(a)(1).

### § 8(a)(1): Solicitation of Employee Complaints and Grievances

Prior to the July 2013 election, in March of 2013, Greenbrier distributed an employee satisfaction survey at the Tucson plant. Employees were told that the purpose of the survey was to assess how they felt about working at the plant, and what improvements could be made. The anonymous survey sought feedback on issues such as job satisfaction, their supervisors, safety issues, and whether they would recommend the job to others. Petitioner argues that Greenbrier violated § 8(a)(1).

 "[I]n the absence of a previous practice of doing so, the solicitation of grievances by an employer during an organizational campaign violates the Act ... The solicitation of grievances alone is not unlawful, but it raises an inference that the employer is promising to remedy the grievances. This inference is particularly

compelling when, during a union organizational campaign, an employer that has not previously had a practice of soliciting employee grievances institutes such a practice ... While an employer who has had a past practice and policy of soliciting grievances may continue to do so during an organizational campaign, an employer cannot rely on past practice if it significantly alters its past manner and methods of solicitation during the campaign." *Center Service System Division,* 345 NLRB 729, 730 (2005); *Alamo Rent–A–Car,* 336 NLRB 1155, 1155 (2001) ("[Employer] violated the Act by soliciting employee grievances and impliedly promising to remedy them during a ... employee meeting ... [T]he employees could reasonably infer that the Respondent was soliciting their complaints for the purpose of acting favorably on them in order to blunt the employees' enthusiasm for, or at least perceived need for, the Union.").

Greenbrier argues that the idea for the written survey came solely from the new plant manager (Eric Valenzuela). Valenzuela was taking a psychology class during this period of time, had seen some surveys in his studies, and therefore thought it was a good idea to have a survey at the Tucson plant. However, Valenzuela never conducted a written survey for his employers in previous management positions. In addition, such a written survey had not been distributed to Tucson employees in the past. Petitioner has shown a likelihood of success that the written survey violated § 8(a)(1).

### § 8(a)(1): Threats to Employees

Employer threats of job loss, plant closure, and other adverse employment actions stemming from Union activities violate § 8(a)(1). Petitioner argues that certain statements made by Greenbrier management to employees violated the Act.

Shortly before the July 2013 election, management held captive-audience meetings with Tucson employees in June and July of 2013. Petitioner argues that Greenbrier violated § 8(a)(1) as it made various prohibited threats about job loss and negative employment actions related to the Union. For example, management told employees that their single largest customer (TTX) was adverse to unions, sends railcars to Tucson because its non-union, that there was a risk that TTX would stop sending rail cars to Tucson if it unionized, that the Tucson shop could close due to the problems caused by unions especially in light of Tucson's recent problems, and that Greenbrier was being forced to spend large amounts of money on attorneys' fees defending against the Union's unfair labor practice allegations at a time when the Tucson shop is struggling to make a profit to remain open. Upper management from TTX denied such claims as to its position and actions in relation to unions. When Greenbrier management relayed these messages to employees, they did not present any objective basis to support their claims. *See Jewish Home for the Elderly of Fairfield County,* 343 NLRB at 1096 (employer violated the Act where it threatened job loss and plant closure related to the employees' unionization actions); *National Propane Partners, L.P.,* 337 NLRB 1006, 1017 (2002) ("[T]he Board has recognized the right of an employer to make predictions as to the precise effects he believes unionization will have on his company, but the predictions must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control ... [Here the employer's] statements contain no such objective fact and are simply threats of discharge and plant closure if employees unionize [in violation of the Act]."); *North Star Steel Company,* 347 NLRB 1364,

1365–66 (2006) (employer's statement that company would lose the ability to be flexible during economic downturns if employees unionized a violation as the company furnished no objective basis for claiming that unionization would adversely affect its ability to be flexible during economic downturns); *Tellepsen Pipeline Services Co. v. NLRB*, 320 F.3d 554, 564 (5th Cir. 2003) (employer's comment that customer could terminate its contract if the Union won and all employees could possibly lose their jobs constituted implied threats of reprisals in violation of § 8(a)(1)); *Blaser Tool & Mold Co., Inc.*, 196 NLRB 374, 374 (1972) (employer's statement of concern that major customer might stop doing business with the company if employees voted for the union constituted an implied threat of job loss and plant closure as there was no objective factual basis for the comment); *Mesker Door, Inc.*, 357 NLRB No. 59 slip. op. (2011), 2011 WL 3739685, *8 (employer's statement that money spent on legal fees defending against unfair labor practice charges could have been spent on improving life at the plant a violation as it sent the message that filing charges was a futile act that cost employees larger bonuses; "reference to money lost to the lawyers is essentially a statement saying that the unionization process was costing the employees money, for it would have gone to them had they not begun the process [and] violates Section 8(a)(1) for it attempts to teach the lesson that unionization is self-defeating and thus a futility.").

Petitioner has shown a likelihood of success that statements made at the June and July 2013 meetings violated § 8(a)(1).

### Gissell Bargaining Order

Section 8(a)(5) of the NLRA states that it "shall be an unfair labor practice for an employer … to refuse to bargain collectively with the representative of his employees, subject to the provision of section 159(a) of this title." Section 159(a) states:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment …"

Petitioner argues that pursuant to *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), Respondent is obligated under the NLRA to recognize and bargain with the Union based solely on the possession of the signed union authorization cards reflecting majority support for the union. In *Gissel*, the Court held that an employer's duty to bargain can arise without a Board election under the NLRA and that union authorization cards, if obtained from a majority of employees without misrepresentation or coercion, can provide a valid, alternate route to majority status. *Id.* at 579, 89 S.Ct. 1918. The Court further found that a bargaining order is an appropriate remedy where an employer rejects a card majority while at the same time committing unfair labor practices that undermine the union's majority and make a fair election an unlikely possibility. *Id.*

In *Scott ex rel. N.L.R.B. v. Stephen Dunn & Associates*, 241 F.3d 652 (9th Cir.2001), the Ninth Circuit addressed the *Gissel* issue, stating in part:

In *Gissel*, the Supreme Court held that the Board may order an employer to recognize and bargain with a union even when employees have not chosen union representation through the normal election procedure. These bargaining orders are appropriate in two limited circumstances. First, when an employer has engaged in such outrageous and pervasive unfair labor practices that a fair and reliable election can't be held, the

Board may order bargaining even absent a showing of majority support for the Union ... Second, the Board may order bargaining when the Union shows that it once had a majority and that its support was undermined by unfair practices that impede[d] the election process ... [The Board] must show both that the Union secured the support of a majority of [the] employees and that [the employer] subsequently engaged in unfair labor practices that undermined the Union's majority and impeded the election process ... Whether the Regional Director provided sufficient evidence of majority status turns on the validity of the ... union authorization cards [reflecting that a majority of the pertinent employees supported the Union] ... The evidence supporting the Regional Director's contention of majority support easily surpasses [the] minimal showing [required to show majority status]. The cards themselves are unambiguous. Each card states simply that the card signer 'authorized the above named Union to represent me in collective bargaining with my Employer.' ... [Once a majority is established, the Court] turn[s] to the question of whether the unfair labor practices compel the granting of an interim bargaining order ... [W]hether the Board will issue a bargaining order in the underlying administrative proceeding turns on the effect of the alleged unfair labor practices on a subsequent representation election. This inquiry is not mechanistic, but rather requires consideration of the specific facts of each case. In other words, in the wake of [the employer's] illegal activity, is it possible for employees to make a free and informed choice regarding union representation?

*Id.* at 661–65, 666 (concluding that "despite the disfavored nature of bargaining orders, the Regional Director has made a stronger case than [the employer] that it will prevail after final proceedings before the Board. Further, the standard to be applied in a request for section 10(j) relief is distinct from that applied by the Board. The district court in a section 10(j) proceeding is not asked to make an independent determination as to whether a bargaining order is appropriate. Rather, in order for the Regional Director to satisfy the likelihood of success test ... he need only present a fair chance of succeeding on the merits. The existence of at least one 'hallmark' violation of the NLRA (i.e., the wage increase) is sufficient to satisfy this minimal test and allow a consideration of the balance of hardships resulting from an interim bargaining order.")[4]; *see also Gissel Packing Co., Inc.*, 395 U.S. at 614–15, 89 S.Ct. 1918 ("The Board's authority to issue such [a bargaining order] on a lesser showing of employer misconduct is appropriate, we should reemphasize, where there is also a showing that at one point the union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior. In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bar-

**4.** Abrogated on other grounds. *See McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 957 (9th Cir.2010).

gaining order, then such an order should issue.")

The record reflects that by 11/8/12, the SMW obtained 50 signed SMW union authorization cards; this is a majority of the 92 production employees at issue. The signed authorization cards state in part: "I, the undersigned, hereby authorize the SHEET METAL WORKERS INTERNATIONAL ASSOCIATION . . . to represent me for purposes of Collective Bargaining, and in my behalf, to negotiate and conclude all agreements as to hours of labor, wages, and other conditions of employment." There is testimony that when these cards were distributed, employees were told to read the card and sign it if they agreed, and that by signing the card employees agreed to be represented by the SMW. There is also testimony from employees that it was their understanding that by signing the card, they authorized the SMW to represent them. These cards were obtained without coercion or misrepresentation. While the SMW had not yet requested bargaining with Greenbrier by 11/8/12, the record reflects that Greenbrier had began its anti-union actions by at least October of 2012 as discussed earlier in this Order. Thus, upon securing a majority on 11/8/12, the SMW became the exclusive bargaining representative for the petitioned-for unit of employees in Tucson. *See Parts Depot, Inc.*, 332 NLRB 670, 678 (2000) ("[T]he Government has established the validity of the 66 authorization cards . . . That number is a majority of the . . . employees in the bargaining unit . . . The next question is when did the Union achieve its majority status. Under Board

law, when (as here) there has been no demand for bargaining (other than what might exist from the petition filed), the obligation to bargain attaches as of the date the respondent begins a campaign of unfair labor practices, if the Union has a majority at that date, and if no majority at that time, then when the Union attains a majority.").[5] As discussed in detail above, Greenbrier engaged in an extensive anti-union campaign that included laying off a third of its work force, closing its Tucson factory, interrogation and the impression of surveillance, promises and grants of benefits, solicitation of employee complaints and grievances, and threats to employees. Based on such actions, Greenbrier completely undermined any past and future support for the SMW, and Petitioner has shown a likelihood of success that a *Gissel* bargaining order is warranted in this case such that Greenbrier is required to bargain with the Union on a interim basis while this case is pending before the NLRB. *See, e.g., Gissel Packing Co., Inc.*, 395 U.S. at 614–15, 89 S.Ct. 1918; *Stephen Dunn & Associates*, 241 F.3d at 661–65, 666; *NLRB v. Electro–Voice, Inc.*, 83 F.3d 1559, 1571–72 (7th Cir.1996); *NLRB v. Fort Vancouver Plywood Co.*, 604 F.2d 596, 600–601 (9th Cir.1979); *Hambre Hombre Enterprises, Inc. v. NLRB*, 581 F.2d 204, 207 (9th Cir.1978); *NLRB v. Tischler d/b/a Devon Gables Nursing Home*, 615 F.2d 509 (9th Cir.1980); *NLRB v. Anchorage Times Pub. Co.*, 637 F.2d 1359, 1370 (9th Cir.1981), cert. denied, 454 U.S. 835, 102 S.Ct. 137, 70 L.Ed.2d 115 (1981); *Carter & Sons Freightways, Inc.*, 325 NLRB 433, 440 (1998); *Joy Recovery*

---

**5.** The record reflects that Greenbrier failed to bargain regarding the decision and effects of the layoffs and the plant closure (that factored in either direct or indirect labor costs in the decision); these were mandatory subjects of bargaining and Petitioner has shown a likelihood of success that these actions (or lack thereof) violated § 8(a)(5) of the Act. *See*

*NLRB v. Advertisers Mfg., Co.*, 823 F.2d 1086, 1090 (7th Cir.1987); *McClain E–Z Pack, Inc.*, 342 NLRB 337, 342 (2004); *Vico Products Co., Inc. v. NLRB*, 333 F.3d 198, 206 (D.C.Cir. 2003); *A–1 Fire Protection, Inc.*, 273 NLRB 964, 967 (1984); *San Luis Trucking, Inc.*, 352 NLRB 211, 230 (2008).

*Technology Corp.,* 320 NLRB 356, 368 (1995) enf'd 134 F.3d 1307 (7th Cir.1998); *Sumo Container Station, Inc.,* 317 NLRB 383, 393 (1995).

## IRREPARABLE HARM, BALANCE OF HARDSHIPS, PUBLIC INTEREST

 "In the context of the NLRA, permit[ting an] alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority is irreparable harm ... In other words, while a district court may not presume irreparable injury with regard to likely unfair labor practices generally, irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief. In making the latter determination, inferences from the nature of the particular unfair labor practice at issue remain available." *Frankl,* 650 F.3d at 1362; *see also Kreisberg v. HealthBridge Management, LLC,* 732 F.3d 131, 142–143 (2d Cir.2013) ("The appropriate test for whether harm is irreparable in the context of § 10(j) cases is whether the employees' collective bargaining rights may be undermined by the asserted unfair labor practices and whether any further delay may impair or undermine such bargaining in the future. The appropriate status quo in need of preservation is that which was in existence before the unfair labor practice occurred."). "[I]n considering the balance of hardships, the district court must take into account the probability that declining to issue the injunction will permit the alleged unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority ... [A] determination that the Regional Director had shown likely irreparable harm to the collective bargaining process mean[s] that there [is] also considerable weight on his side of the balance of the hardships." *Frankl,* 650 F.3d at 1362. "In § 10(j) cases, the public in-

terest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge ... Ordinarily ... when ... the Director makes a strong showing of likelihood of success and of likelihood of irreparable harm, the Director will have established that preliminary relief is in the public interest ... The purpose of § 10(j) relief is to preserve the Board's remedial power ... The task of the Board in devising a final remedy is to take measures designed to recreate the conditions and relationships that would have been had there been no unfair labor practice ... Very often, the most effective way to protect the Board's ability to recreate such relationships and restore the status quo will be for the court itself to order a return to the status quo." *Id.* at 1365–66.

To restore the status quo and preserve the Board's remedial power, Petitioner requests an interim restoration of Greenbrier's operations at its Tucson facility and an interim *Gissel* bargaining order directing Greenbrier to bargain in good faith to an agreement or an impasse over the terms of a labor agreement, or a lawfully motivated reason to move the Tucson facility. In addition, Petitioner specifically requests that any interim relief granted include an order requiring Greenbrier to: reopen the Tucson facility; reinstate the employees who were discharged or transferred; request that TTX restore the work it was previously sending to the Tucson facility at the same hourly rate TTX was previously being charged—and transfer work from its other facilities to Tucson, to the extent feasible, in the event TTX declines the request; requiring Greenbrier to recognize and bargain with the Union on an interim basis; a notice-reading remedy; and a broad cease-and-desist order requiring Greenbrier to refrain from continuing to

engage in unfair labor practices in violation of the Act.

■ The record reflects that the remaining three factors (irreparable harm, balancing of hardships, and public interest) weigh in favor of Petitioner, and he is entitled to the relief requested. Before Greenbrier began its unfair labor practices, union support was strong and Tucson employees collected a majority of union authorization cards within a couple of weeks for two separate unions. In response, as discussed in detailed throughout this Order, Greenbrier engaged in an anti-union campaign that included laying off a third of its work force, closing its Tucson factory, interrogation and the impression of surveillance, promises and grants of benefits, solicitation of employee complaints and grievances, and threats to employees; these actions gutted any past and future support for unionization. This is reflected in the overwhelming SMW election defeat in July of 2013; only 14 employees voted for the Union, while 45 voted against the Union. Prior to these unfair labor practices, employees strongly favored unionization, and additional delay in granting the relief requested by Petitioner will undercut the employees' bargaining rights.

There are still former Greenbrier employees in Tucson, and others that still have connections to Tucson; however, as more time passes before granting relief, an increased number of employees will have obtained employment elsewhere, settled into new locations where they have been transferred, and therefore the prospect of working in Tucson and with Greenbrier decreases. In the interim before the Board issues its decision, the Tucson plant would likely be sold, all former employees would be working in other locations or for other employers and will have no desire to return to Tucson, and former customers would be unwilling to send work to Tucson as they have been receiving repairs elsewhere for an extended period of time. These eventualities would jeopardize future remedies ordered by the Board. While Greenbrier will incur costs in granting the relief requested by Petitioner, it is not an undue burden.[6] In addition, the hardships to Greenbrier are minimal compared to the statutory rights and collective bargaining process at issue. Greenbrier still owns the land where the Tucson plant is located, still has some infrastructure and equipment there, and many experienced Tucson employees and management are still employed by Greenbrier at other locations. The Tucson plant could reopen and still support approximately 17 full-time employees even without TTX work, and customers other than TTX appear willing to send repair work to Tucson. There are still 23 bargaining unit employees in Tucson who were laid-off and did not relocate. The record reflects that non-TTX customers accounted for 22% of total revenues, that total revenues from non-TTX customers during the time at issue accounted for almost $6,000,000; of the non-TTX customers, Greenbrier's own railcars accounted for 19% of total revenues (approximately $3,600,000) and generated $157,240 per month in revenues working on its own railcars in the Tucson shop. Thus, the Tucson shop could reopen with a group of 17 employees to repair its own railcars and other non-TTX customers; although it

**6.** See Lear Siegler, Inc., 295 NLRB 857, 862 (1989); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 215, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); NLRB v. Flamingo–Hilton Reno, Inc., 1998 WL 84154, *4 (9th Cir. 1998) enforcing 321 NLRB 409 (1996); Mid–South Bottling Co. v. NLRB, 876 F.2d 458 (5th Cir.1989) enforcing 287 NLRB 1333 (1988); Reno Hilton Resorts v. NLRB, 196 F.3d 1275 (D.C.Cir.1999) enforcing 326 NLRB 1421 (1998); Power Inc., 311 NLRB 599, 600 (1993)

would be smaller than its size prior to the unfair labor practices at issue, Greenbrier has such smaller operations in Hodge, Louisiana (12 employees) and Philadelphia, Pennsylvania (9 employees). The Court also notes that throughout 2013, prior to the decision to close, Tucson was a profitable shop. In 2013, The Greenbrier Companies, Inc. had revenues of $1.7 billion and earnings from operations of $41.65 million. Upon reopening and reinstating employees, Greenbrier would have experienced employees to perform work, have the right to manage as it pleases in a non-discriminatory manner, and the interim Order only requires Greenbrier to bargain with the Union in good faith periodically to reach an agreement or a bona fide impasse. The hardship to Greenbrier is minimal compared to the impairment of the statutory rights and collective bargaining process at issue in this case. Without the interim injunctive relief requested by Petitioner, Greenbrier's unfair labor practices will reach fruition and the Board's remedial authority will be undercut; granting interim relief favors the public interest by protecting the statutory rights and collective bargaining process at issue, and preserving the Board's remedial authority.

Based on the record before the Court and the foregoing discussion throughout this Order, the Court will issue an order granting interim restoration of Greenbrier's operations at its Tucson facility; an interim *Gissel* bargaining order directing Greenbrier to bargain in good faith to an agreement or an impasse over the terms of a labor agreement, or a lawfully motivated reason to move the Tucson facility; and the specific relief reflected above. *See, e.g., We Can, Inc.,* 315 NLRB 170, 175 (1994); *San Luis Trucking, Inc.,* 352 NLRB 211, 230 (2008), enf'd, 479 Fed.Appx. 743 (9th Cir.2012); *NLRB v. Joy Recovery Technology Corp.,* 134 F.3d 1307, 1316 (7th Cir.1998); *Frye v. Seminole Intermodal Transport Inc.,* 1992 WL 321555, *3

(S.D.Ohio 1992); *O'Dovero v. NLRB,* 193 F.3d 532 (D.C.Cir.1999); *Vico Products, Inc.,* 333 F.3d 198, 213 (D.C.Cir.2003); *Geiger Ready–Mix of Kansas City,* 315 NLRB 1021, 1022–23 (1994), enforced as modified 87 F.3d 1363, 1368–71 (D.C.Cir. 1996); *Woodline Motor Freight, Inc. v. NLRB,* 843 F.2d 285, 291 (8th Cir.1988); *Cub Branch Mining Inc.,* 300 NLRB 57 (1990); *N.C. Coastal Motor Lines, Inc.,* 219 NLRB 1009 (1975), enf'd, 542 F.2d 637 (4th Cir.1976); *Power Inc.,* 311 NLRB at 599–600, fn. 3–4; *Carter & Sons Freightways, Inc.,* 325 NLRB 433 (1998); *NLRB v. Tomco Carburetor Co.,* 853 F.2d 744 (9th Cir.1988); *Town & Country Mfg. Co. v. NLRB,* 316 F.2d 846, 847 (5th Cir.1963); *NLRB v. Cofer,* 637 F.2d 1309, 1315 (9th Cir.1981).

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED as follows:

(1) Petitioner's Petition for Temporary Injunction Under Section 10(j) [29 U.S.C. § 160(j)] of the National Labor Relations Act is granted; the Court has also attached a separate Order as to the temporary injunction.

## ORDER GRANTING TEMPORARY INJUNCTION

This cause came to be heard upon the verified petition of Cornele A. Overstreet, Regional Director for Region 28 of the National Labor Relations Board (Petitioner), by and on behalf of the National Labor Relations Board (the Board), for a temporary injunction pursuant to Section 10(j) of the National Labor Relations Act, as amended (the Act), pending the final disposition of the matter involved pending before the Board, and upon issuance of an order scheduling a hearing. All parties were afforded full opportunity to be heard, and the Court, upon consideration of the pleadings, record evidence, briefs, and the

entire record in the case, finding and concluding that Petitioner has a substantial likelihood of success in prevailing in the underlying administrative proceedings and will establish that Gunderson Rail Services, LLC d/b/a Greenbrier Rail Services (Respondent) has engaged in, and is engaging in, acts and conduct in violation of Section 8(a)(1), (3), (4), and (5) of the Act, affecting commerce within the meaning of Sections 2(6) and (7) of the Act, and that Respondent will, unless enjoined, continue to engage in those acts and conduct, or similar acts and conduct constituting unfair labor practices during the proceedings before the Board.

Now, therefore, upon the entire record, it is **ORDERED, ADJUDGED, AND DE-CREED** that, pending the final disposition of the matter involved pending before the Board, the Petition for Temporary Injunction should be, and hereby is, granted in the manner specifically set forth below:

Respondent, its officers, agents, servants, representatives, successors, and assigns, and all persons acting in concert with it or them, be, and they hereby is, enjoined and restrained from:

(a) interrogating employees about their union membership, activities, and sympathies, and the union membership, activities, and sympathies of other employees;

(b) creating an impression among its employees that their union activities are under surveillance by Respondent;

(c) promising its employees increased benefits and pay, including erasing their accumulated attendance points, in order to dissuade employee support for the Union;

(d) granting increased benefits and pay to its employees, including eliminating their accumulated attendance points, in order to dissuade their support for the Union;

(e) promising its employees increased benefits and pay, including an increase in the maximum hourly pay rate, in order to dissuade their support for the Union;

(f) granting its employees increased benefits and pay, including increasing the maximum hourly pay rate, in order to dissuade their support for the Union;

(g) implementing a safety committee and raffle for employees in order to dissuade their support for the Union;

(h) by soliciting employee complaints and grievances, promising its employees increased benefits and improved conditions of employment if they refrained from union organizational activity;

(i) engaging in the surveillance of employees engaged in union activity;

(j) threatening employees with plant closure if they selected the Union as their collective-bargaining representative;

(k) denigrating the Union by telling its employees that Respondent was spending money on attorney fees to defend against unfair labor practice charges during difficult economic times, in order to discourage employees from supporting the Union;

(*l*) threatening employees with plant closure by issuing to them WARN Act notices announcing the closure of the Tucson, Arizona facility;

(m) laying off its employees because Respondent believed the employees assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities;

(n) discharging its employees because they assisted the Union and engaged in Union and other concerted activities, and to discourage employees from engaging in these activities;

(*o*) failing and refusing to recognize and bargain in good faith with the Union as the exclusive collective-bargaining representative of employees in the following unit:

All full-time and regular part-time AAR write-up employees, airmen, laborers, material handlers, maintenance mechanics, painters, switchmen, and welder repairmen located at Respondent's Tucson, Arizona facility, excluding all other employees, including quality assurance inspectors, office clericals, guards, safety coordinators, plant managers, production managers, foremen, quality assurance managers, material managers, plant accounting managers, and supervisors as defined in the Act.

(p) unilaterally, without first providing the Union with notice and the opportunity to bargain, implementing and/or making changes to employee working conditions, including but not limited to: increasing the maximum hourly rate; implementing a safety committee and raffle; and ceasing the safety committee and raffle;

(q) unilaterally, without first providing the Union with notice and the opportunity to bargain, recalling laid-off employees;

(r) unilaterally, without first providing the Union with notice and the opportunity to bargain, discharging employees;

(s) further transferring work or selling, transferring, or relocating assets or real property from its Tucson facility; and

(t) in any other manner interfering with, restraining, or coercing its employees in the exercise of their Section 7 rights.

**IT IS FURTHER ORDERED** that Respondent, its officers, agents, servants, representatives, successors, and assigns, and all persons acting in concert with it or them, pending the final disposition of the matters involved herein pending before the Board and to the extent that it has not already done so, shall take the following affirmative actions:

(a) Within five (5) days of the Court's issuance of an Order Granting Temporary Injunction, to the extent that they have not already been reinstated, offer, in writing, to Alex Amador, Jesus Fernando Barnes, David Bottineau, Oswaldo Chavira, Karim Duqmaq, Hector Federico, Jaime Hernandez, Jesus Armando Lopez–Nuno, Jorge Martinez, Ricardo Martinez, Karl Mason, Juan Morales, Chad Morshback, Guillermo Murguia, Jose Angel Ortega, Carlos Contreras Ortiz, Gabriel Ortiz, Brian Perona, Guillermo Gonzalez Pico, Jesus Omar Ramos, Jeff Raske, Jesus Ruiz, Oscar Salinas, Brian Scaggs, Jose Manuel Sepulveda, Frank Soto, Martin Valdez, Rogelio Martinez, and Juan Silva, immediate reinstatement to their former respective positions, and if such jobs no longer exist, to substantially equivalent positions, without any loss to their seniority rights or any other privileges;

(b) Within fourteen (14) days of the Court's issuance of an Order Granting Temporary Injunction, remove from its files, any and all records of its layoffs and/or discharges of Alex Amador, Jesus Fernando Barnes, David Bottineau, Oswaldo Chavira, Karim Duqmaq, Hector Federico, Jaime Hernandez, Jesus Armando Lopez–Nuno, Jorge Martinez, Ricardo Martinez, Karl Mason, Juan Morales, Chad Morshback, Guillermo Murguia, Jose Angel Ortega, Carlos Contreras Ortiz, Gabriel Ortiz, Brian Perona, Guillermo Gonzalez Pico, Jesus Omar Ramos, Jeff Raske, Jesus Ruiz, Oscar Salinas, Brian Scaggs, Jose Manuel Sepulveda, Frank Soto, Martin Valdez, Rogelio Martinez, and Juan Silva,

and within three (3) days thereafter, notify them in writing that this was done, and that the material removed will not be used as a basis for any future personnel action against them or referred to in response to any inquiry from any employer, employment agency, unemployment insurance office, or reference seeker, or otherwise used against them;

(c) Post copies of the Court's Order Granting Temporary Injunction at Respondent's facility, as well as translations of such an Order in Spanish and languages other than English as necessary to ensure effective communication to Respondent's employees as determined by the Regional Director, said translations to be provided to Respondent by the Regional Director, in all places where notices to its employees are normally posted; maintain these postings during the Board's administrative proceeding free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to its facilities to monitor compliance with this posting requirement;

(d) In addition to physical posting of paper copies of an Order Granting Temporary Injunction Order, distribute the Court's Order electronically, such as by e-mail, posting on an intranet site or an internet site, or other electronic means, if Respondent customarily communicates with its employees by such means. Respondent shall e-mail to the Regional Director, to the attention of Region 28's Compliance Officer, at Miguel. Rodriguez@nlrb.gov, a link to the electronic posting location on the same day as the posting. In the event that passwords or other log-on information is required to access the electronic posting, Respondent agrees to provide such access information to the Region's Compliance Officer. If the Notice is distributed via e-mail, Respondent will forward a copy of the e-mail distributed to the Region's Compliance Officer.

(e) Within ten (10) days of the Court's issuance of an Order Granting Temporary Injunction, hold a meeting or meetings at which the Court's Order is to be read to the employees by a responsible agent of Respondent, by or in the presence of Mike Torra, Al Lave, Juan Maciel, and Lisa Maxey, or the successor to any of these individuals, and in the presence of an agent of the Board, or, at Respondent's option, by a Board Agent in the presence of Torra, Lave, Maciel, and Maxey, or the successor to any of these individuals, to all employees employed by Respondent at Respondent's facility, including at multiple meetings and in Spanish and other languages, if necessary as determined by the Regional Director, to ensure that it is read aloud to all employees;

(f) Recognize the Union as the collective-bargaining representative of the Unit;

(g) Bargain in good faith with the Union with respect to rates of pay, wages, hours of work, and other conditions of employment, and if an understanding is reached, embody such understanding in a signed agreement;

(h) Restore operations at Respondent's facility to the status quo ante and maintain those operations by, *inter alia,* requesting its customer, TTX, to restore bargaining unit work at the Tucson facility at its prior hourly rates;

(i) Within five (5) days of the Court's issuance of an Order Granting Temporary Injunction, to the extent that they have not already been reinstated, offer, in writing, to bargaining unit employees who were employed by Respondent at its Tucson facility on September 5, 2013 immediate reinstatement to their former

respective positions, and if such jobs no longer exist, to substantially equivalent positions, without any loss to their seniority rights or any other privileges;

(j) To the extent that work at the Tucson facility is insufficient to provide reinstatement as described in paragraph 2(i) above, to transfer work from other facilities of Respondent to the Tucson facility and/or establish a preferential hiring list; and

(k) Within twenty days of the Court's issuance of an Order Granting Temporary Injunction, submit to the Court and the Regional Director for Region 28 of the Board a sworn affidavit from a responsible agent of Respondent stating, with specificity, the manner in which Respondent has complied with the terms of the Court's Order.

## ORDER CLARIFYING INJUNCTION PURSUANT TO 29 U.S.C. § 160(j) (SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT)

On this day, the Court considered the Motion for Clarification of Order Granting Temporary Injunction (Motion), filed by Gunderson Rail Services (Respondent) on March 20, 2014 (Docket # 48). On April 7, 2014, Petitioner Cornele A. Overstreet, on behalf of the National Labor Relations Board (Petitioner) filed its Response to Respondent's Motion. After due consideration, the Court adopts fully all aspects of the Order Granting Temporary Injunction pursuant to 29 U.S.C. § 160(j) ("Opinion and Order") (Docket # 47), which the Court entered in this matter on March 14, 2014.

The Court **FURTHER ORDERS** the following:

(1) Within 10 days of this Order, Respondent is to restore operations at Respondent's Tucson facility (Tucson facility) to the status quo ante, to wit, restore the capabilities, equipment, workforce, and volume of work at the Tucson facility as they existed in October 2012;

(2) As part of its obligation to restore operations at the Tucson facility, Respondent is to: (a) send its own cars and equipment (including the cars and equipment of Respondent's related corporate entities) to the Tucson facility for work and repair, sending the same number of cars and amount of equipment as the Respondent sent on average during the period from November 1, 2011, through September 30, 2013 (as set forth in General Counsel Exhibit 268, which was admitted into evidence in the underlying administrative hearing and is part of the record in this matter); (b) inform its customer, TTX, that it will charge TTX the hourly labor rates that were in effect in 2013 (as set forth in General Counsel Exhibit 277, which was admitted into evidence in the underlying administrative hearing and is part of the record in this matter), for work performed for TTX at the Tucson facility; (c) inform TTX as well as other past customers of Respondent that the Tucson facility is open and ask that those customers return their work to the Tucson facility; and (d) compete for new and additional customers to send work to the Tucson facility, by using the same or similar methods that Respondent used to seek new and additional customers for the Tucson facility before October 2012;

(3) To the extent economically feasible, transfer work from Respondent's other facilities to the Tucson facility, until such time as the aggregate monthly work-volume reaches the same level as existed at the Tucson facility before October 2012 (as set forth in General Counsel Exhibit 268 referenced above);

(4) In the event there are insufficient openings to accommodate all the former Tucson-based employees who wish to return to work at the Tucson facility, includ-

ing those workers who have transferred to Respondent's other facilities, Respondent is to bargain in good faith with the Sheet Metal Workers' International Association, Local 359, AFL–CIO ("Union") about the creation of a non-discriminatory preferential recall list ("recall list"), and return employees to work at the Tucson facility pursuant to that recall list; those employees who chose to accept employment by Respondent at its other facilities are free to remain so employed, and are under no obligation to accept Respondent's non-discriminatory offers to return to work in Tucson.

**IT IS FURTHER ORDERED** that, pending the final disposition in this matter before the Board, Respondent is enjoined and restrained from discriminating, in any manner, against any former Tucson-based employee based on their individual decision to either accept, or decline, Respondent's offer to reinstate that employee to the Tucson facility.